**Michael G. TYSON, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–9203–CR–129.**

Court of Appeals of Indiana, Second District.

Aug. 6, 1993.

Transfer Denied Sept. 22, 1993.

Lee B. McTurnan, Judy L. Woods, McTurnan & Turner, Indianapolis, Alan M. Dershowitz, Cambridge, MA, James H. Voyles, Symmes Voyles Zahn Paul & Hogan, Indianapolis, Nathan Z. Dershowitz, Jamin S. Dershowitz, Dershowitz & Eiger,

P.C., New York City, for appellant-defendant.

Pamela Lynn Carter, Atty. Gen., Matthew Ryan Gutwein, Lawrence Mark Reuben, Arend J. Abel, Deputy Attys. Gen., Indianapolis, argued (Linley E. Pearson, Atty. Gen., William E. Daily, Chief Counsel, Gary Damon Secrest, Lisa M. Paunicka, Deputy Attys. Gen., on brief), for appellee-plaintiff.

SHIELDS, Judge.

Michael G. Tyson appeals his convictions of rape [1] and two counts of criminal deviate conduct,[2] all class B felonies.

We affirm.

## ISSUES

Tyson raises issues for our review which we reorder and rephrase as:

1. Did the trial court err when it refused to grant Tyson leave to call witnesses for the defense who were not included on his list of witnesses?

2. Did the trial court err when it excluded evidence of alleged incidents between D.W. and her parents?

3. Did the trial court err when it excluded evidence of D.W.'s alleged prior sexual conduct?

4. Did the trial court err when it admitted an audio tape of D.W.'s call to 911, the emergency response number?

5. Did the trial court err when it allowed the State to read from Justice White's partial dissent in *United States v. Wade* during closing argument?

6. Did the trial court err when it rejected Tyson's tendered jury instructions on the State's burden of proof and on mistake of fact?

7. Did the trial court err when it refused Tyson's tendered jury instruction on the jury's duty to accept the court's instructions as the law?

8. Did the manner by which the trial judge was selected violate Tyson's right to due process?

## FACTS

Tyson was charged with rape, two counts of criminal deviate conduct, and confinement. The confinement charge was dismissed during trial; the jury convicted Tyson of the remaining charges.

Facts pertinent to the issues on appeal appear in the discussion of the particular issue.

## DECISION[3]

### I.

Tyson argues the trial court erred when it refused to permit him to call as witnesses three women who came forward during the course of the trial.[4] The trial court did not abuse its discretion when it refused to allow the witnesses to testify.

#### A. Relevant Facts

Prior to trial, on December 11, 1991, the trial court granted the State's discovery motion and ordered that "the Defendant shall disclose to the State of Indiana the names, addresses and phone numbers of all witnesses whose testimony will be relevant specifically to the issue of whether the victim consented to sexual intercourse with the Defendant, on or before December 18, 1991." Record at 493.

Voir dire began on Monday, January 27, 1992; the State began presenting its case on Thursday, January 30, 1992. In the afternoon of that same Thursday, and while the trial court was in session, a secretary from Black Expo contacted the law

1. *See* IC 35-42-4-1(1) (1992 Supp.).

2. *See* IC 35-42-4-2(1) (1988).

3. Our resolution of each issue pertains to all three charges of which Tyson was convicted, although for clarity's sake, our discussion may center on only one of the convictions.

4. The motions Tyson used to seek leave to call these witnesses were entitled Motion for Leave to Name Additional Witnesses and Motion for Reconsideration of Order Excluding Newly Discovered Witnesses.

office of James Voyles, one of Tyson's trial attorneys, and told an associate, Mark Webb, that three women had come forward claiming to have information regarding the Tyson case. Webb spoke to one of the women by telephone midday Friday, and had a face-to-face interview with two of the women, Carla Martin and Pam Lawrence, on Friday evening.[5]

On Friday evening, immediately after his interview with Martin and Lawrence, Webb met with Tyson's trial attorneys, Voyles and F. Lane Heard, III, and told them what he had learned. Voyles and Heard decided to inspect the limousine to determine whether Martin and Lawrence could have seen through the windows as they claimed. Tyson's counsel prepared a motion to produce the limousine and, after viewing it on Saturday evening, Voyles and Heard concluded that it was possible to see through the tinted windows. Voyles and Heard also decided personally to interview Martin and Lawrence, which they did at 2:00 p.m. on Sunday, February 2, 1992. After that interview, Voyles contacted Prosecutor Gregory Garrison at home and gave him the names, telephone numbers, and addresses of Martin and Lawrence, along with a summary of the information the women claimed to have. Later on Sunday afternoon, Voyles reached the third woman, Renee Neal, by telephone. Voyles promptly contacted Garrison with Neal's information. Representatives of the prosecution team met with the three women some time the next evening.

On Monday, February 3, 1992, Tyson filed the motion in which he sought leave to call Martin, Lawrence, and Neal as witnesses. A hearing on the motion was held on Tuesday, February 4, after which the court denied the motion. The court also denied Tyson's Motion for Reconsideration, filed on February 7, 1992.

5. There is a conflict in the evidence concerning when Webb first made telephone contact with Martin and Lawrence. In his Motion for Leave to Name Additional Witnesses, filed Monday, February 3, 1992, Tyson states that Webb spoke to two of the potential witnesses by telephone Thursday night and then interviewed them at greater length on Friday. Record at 1136. At the hearing on this motion on Tuesday, February 4, Tyson's attorney stated that Webb contacted one of the witnesses around noon on Friday and conducted a face-to-face interview of Martin and Lawrence later that day. Id. at 4160. This same averment is repeated in Tyson's Motion for Reconsideration, id. at 1163, and in Webb's affidavit, attached as Exhibit A to Tyson's Motion for Reconsideration, id. at 1195–96.

## B. Waiver

The first inquiry is whether, as the State claims, Tyson failed to preserve this issue for review. An offer of proof is the method by which the proponent of evidence preserves any error in its exclusion. "When the proponent does not make an offer of proof, he has not adequately preserved the exclusion of [the] witness' [sic] testimony as an issue for appellate review." Wiseheart v. State (1986), Ind., 491 N.E.2d 985, 991 (citation omitted); see also Jones v. State (1988), Ind., 523 N.E.2d 750, 754. An offer of proof provides the appellate court with the scope and effect of the area of inquiry and the proposed answers, in order that it may consider whether the trial court's ruling excluding the evidence was proper. Thus, the offer of proof must demonstrate the substance, purpose, relevancy, and materiality of the excluded evidence in order to enable the appellate court to determine on appeal whether the exclusion was proper. Strickland v. State (1977), 265 Ind. 664, 670, 359 N.E.2d 244, 249.

The State claims Tyson has waived the issue because his oral offer of proof given during the February 4, 1991, hearing contained only generalized statements of the women's testimony, while his written offer of proof was untimely. The State argues we should not consider the written offer of proof because "it was not provided contemporaneously with the original motion or at the hearing where the exclusion was ordered" and "[s]hould this Court consider the late offer, the fairness and reciprocity upon which discovery is founded ... requires consideration of the State's counter-offer of proof ... when reviewing this issue." Appellee's Brief at 16.

■ The oral offer of proof is too general; however, the written offer provides a detailed summary of the testimony Tyson anticipated eliciting from Martin, Lawrence, and Neal had they been permitted to testify. Hence, the written offer is sufficiently specific to satisfy the requirements of an offer of proof. Furthermore, it is properly before us; the State's argument is untenable. Tyson's written offer of proof was filed during his argument in support of his Motion for Reconsideration. Thus, it was available to the trial court when it ruled on that motion. On the other hand, the State's counter-offer of proof [6] was not available because it was not filed until March 25, 1992, well after the trial court had ruled and the trial had concluded.

The issue of the trial court's exclusion of the testimony of Martin, Lawrence, and Neal has not been waived.

## C. Discussion

■ The trial court ordered disclosure of witnesses whom Tyson reasonably anticipated would testify by December 18, 1991. Necessarily, the names of Martin, Lawrence, and Neal could not have been disclosed by that date inasmuch as Tyson was unaware of their existence until January 30, 1992. However, two of the purposes of pretrial discovery are to promote justice and prevent unfair surprise. These purposes would be frustrated if there was not a continuing duty upon the parties to disclose the identity of newly discovered potential witnesses as soon as reasonably possible; a party could circumvent disclosure merely by failing to diligently discover potential witnesses until after discovery was closed. Here, in an earlier discovery order, the trial court expressly imposed this duty. Record at 198, 201 ("[I]f the defense, after complying with the order to produce, finds either before or during trial additional information or facts which are subject to or covered by such order, defense counsel shall promptly notify the Court and the Prosecution of the existence thereof."). Thus, the issue here is whether Tyson violated his continuing duty to disclose the identity of the three women as soon as reasonably possible.

■ In *Wiseheart v. State* (1986), Ind., 491 N.E.2d 985, our supreme court outlined factors which are appropriate for a trial court to consider in determining its course of action when a party seeks to use the testimony of a witness whose identity is disclosed to the opponent after discovery has been closed. These factors, paraphrased, include:

1. When did the witnesses first become known to opposing counsel?
2. How vital is the potential witnesses' testimony to the case of the proponent of the witness—is it relevant and material or merely cumulative?
3. What is the nature of the prejudice to the opponent—would permitting the witnesses to testify have a deleterious impact on the case prepared by the opponent?
4. Are less stringent alternatives appropriate and effective to protect the interest of the parties?
5. Will the opponent be unduly surprised and prejudiced by the inclusion of the witnesses' testimony despite the available and reasonable alternatives (e.g., a recess or a continuance) to allow the opponent to interview the witnesses and conduct further investigation, if necessary?

*Id.* at 991. On appeal, we apply an abuse of discretion standard; that is, "[a]bsent clear error and resulting prejudice, the trial court's determinations as to [discovery] violations and sanctions should not be over-

---

6. The State's counter-offer of proof asserts Martin would describe the limousine as black in color and would testify that the woman who exited from the backseat of the limousine was approximately "5'6" to 5'7" in height and "was wearing a black mini-skirt and a top which had a collar," Record at 1327–28; that Lawrence would describe the limousine as black or burgundy in color and the driver as a white female with blond hair and testify that Martin asked her the identity of the male who exited the limousine's backseat; and that Neal would testify the limousine was white or gold in color and testify that she bumped into the male who exited from the backseat and "did not recognize him as the defendant because she knows what he looks like." *Id.* at 1329.

turned." *Shumaker v. State* (1988), Ind., 523 N.E.2d 1381, 1383. Based upon the *Wiseheart* factors, the trial court did not abuse its discretion in excluding the testimony of Martin, Lawrence, and Neal.[7]

### 1. Diligence in Notifying the State

The trial began on Monday, January 27, 1992. The office of one of Tyson's trial attorneys was contacted and an associate, Mark Webb, was told about Martin and Neal on Thursday, January 30, 1992, the day the State began presenting its case-in-chief. The prosecution team was first notified of their existence, identity, and the nature of their testimony late in the afternoon on Sunday, February 2, 1992.

Tyson argues the delay was unavoidable because members of the trial team met with the women as soon as possible and "[i]t is not, and cannot be, the law that the defense was obliged either to interview these witnesses earlier than it did *or* to reveal their existence before interviewing them, evaluating their credibility, and making a decision whether it would or might use them." Appellant's Brief at 30 (emphasis in original). This argument overlooks the fact that Webb, an attorney from defense counsel's law firm who had "assisted in various capacities in [the Tyson case]

since it began and ... had various contacts with witnesses in [the] case during that time," Record at 1195, spoke by telephone with one of the women on Friday around noon, and interviewed Martin and Lawrence on Friday evening before meeting with the trial team to apprise them of what he had learned. The trial court reasonably concluded that, at that point, the State should have been notified of the existence of the women and their potential testimony. Indeed, the record fails to reveal why Webb was unable to talk with Martin and Lawrence earlier or why he did not glean the necessary information from telephone interviews; Neal apparently was contacted only by telephone before the State was informed that she was a potential witness.

Trial counsel explains the delay between the time when Webb first learned of the proposed witnesses and when the trial team spoke with them, and the need for the trial team to personally investigate the proposed witnesses, by claiming that trial counsel on both sides had received numerous crank calls from people claiming to have information about the case. This, however, does not explain why the judgment of Webb, who had been assigned to investigate such calls and who felt these witnesses were credible, was not sufficient to justify informing the State of the identi-

---

**7.** The dissent attempts to characterize our review of the trial court's decision to exclude the testimony of Martin, Lawrence, and Neal as beyond that permissible for an appellate court. Specifically, the dissent asserts that our review must focus on the discretion as it was exercised; that is, "we may not attribute to the trial court some legitimate but unexpressed reason" for its decision. Slip Opinion at 54. Our decision does, however, rest on the specific findings made by the trial court; we do not affirm based on unarticulated but legitimate reasons.

In any event, *Palacios v. Kline* (1991), Ind. App., 566 N.E.2d 573, and *City of Elkhart v. Middleton* (1976), Ind., 265 Ind. 514, 356 N.E.2d 207, the cases upon which the dissent relies to support its contention that this court's review is limited to the reasons expressed by the trial court, are distinguishable on several counts. For example, *Palacios* and *City of Elkhart* are civil cases that involve Ind.Trial Rule 15 amended and supplemental pleadings, Ind.Trial Rule 14(A) third-party practice, and Ind.Trial Rule 20(A) permissive joinder of parties issues. In addition, *Palacios* and *City of Elkhart* concern

review of a trial court's exercise of discretion that was premised upon an incorrect legal standard. In contrast, here the trial judge correctly determined that the proper legal standard is that found in *Wiseheart.* Finally, there are a multitude of criminal decisions which hold that a trial court's ruling admitting or excluding evidence may be upheld if there is any basis for the trial court's decision. *See Feliciano v. State* (1985), Ind., 477 N.E.2d 86, 88 (exclusion of evidence on hearsay grounds would be upheld if inadmissible on relevancy grounds); *Hyde v. State* (1983), Ind., 451 N.E.2d 648, 650 (if ruling admitting or excluding evidence was correct, no error will lie if trial court states erroneous reason for decision); *Thurman v. State* (1992), Ind.App., 602 N.E.2d 548, 553, *trans. denied* (erroneous conclusion by trial court that evidence was found in "plain view" and therefore admissible upheld since evidence was found in "open view" and would have been admissible under this exception to warrant requirement); *Wright v. State* (1992), Ind.App., 591 N.E.2d 1053, 1056, *trans. denied* (apparently unexplained decision excluding evidence upheld since evidence was merely cumulative).

ty of the women and the subject of their anticipated testimony. It also does not explain why it was necessary for the trial team personally to inspect the limousine before notifying the State; Tyson was familiar with the limousine, and in fact testified that his plans to have sexual intercourse with D.W. in the limousine were thwarted because the partition was not sufficiently dark. *Id.* at 5070–71. In this respect, the trial court appropriately remarked that it could understand trial counsel's assiduity before trial, but was "a little concerned about allowing a trial to proceed" while such diligent investigation took place. *Id.* at 4168.

**8.** According to the dissent, the trial court necessarily erred in excluding the proffered testimony because the exclusion of evidence is appropriate only when a finding of blatant or deliberate misconduct or bad faith is made. However, with all due respect, the dissent is incorrect.
Judge Sullivan relies upon *Jester v. State* (1990), Ind., 551 N.E.2d 840, 842; *Patel v. State* (1989), Ind., 533 N.E.2d 580, 585; and *Boyd v. State* (1985), Ind., 485 N.E.2d 126, 127 to support his position that exclusion of evidence is appropriate only in the rare situation of blatant or deliberate misconduct or bad faith and, further, that the issue of an alleged discovery breach is waived in the absence of a request for a continuance. Taking these issues in reverse order, we agree that a request for a continuance is the predicate for preserving error by the unsuccessful opponent of proffered evidence. However, in the instant case, the dissent would require the State to request a continuance after the trial court announced that it was going to exclude the testimony of Martin, Lawrence, and Neal, apparently to preserve the State's right to respond to Tyson's assertion of error. Logic alone establishes the incongruity of a position that would require the successful opponent of proffered evidence to request a continuance to preserve the right to defend the trial court's exercise of its discretion in its favor. It is impossible to envision a scenario where the opponent of proffered evidence who is successful in his or her efforts to have the evidence excluded would then ask for a continuance for the purpose of meeting the evidence that the trial court is going to exclude.
Further, there are circumstances other than the blatant and deliberate violation of a discovery order where exclusion of evidence is an appropriate exercise of judicial discretion. The error of Judge Sullivan's contrary position was recognized recently by our supreme court: "[N]either our trial rules nor Indiana case law require evidence of bad faith as a prerequisite for excluding testimony." *McCollough v. Archbold Ladder Co.* (1993), Ind., 605 N.E.2d 175,

■ While we, like the trial court, do not attribute blatant and deliberate misconduct or bad faith to Tyson's delay in advising the State of the proposed witnesses' identity,[8] the trial court did not abuse its discretion in determining the delay was excessive; Webb had interviewed Martin and Lawrence at some length and made a judgment regarding the relevance of the information they possessed and their credibility two days before the State was notified.

### 2. *Nature of the Excluded Testimony*

The second *Wiseheart* factor requires an examination of the nature of the excluded testimony.[9]

180–81 (citations omitted) (reversing the decision of this court which relied on *Patel*).

**9.** Tyson's written offer of proof, filed on February 8, 1992, in support of his Motion for Reconsideration, reads as follows:

If called to testify, it is anticipated that Carla J. Martin would testify as follows:
Ms. Martin, along with Ms. Lawrence and Ms. Neal, attended the Johnny Gill concert at the Hoosier Dome on the night of July 18, 1991. Ms. Martin did so because she was the girlfriend of a man who was playing drums in Mr. Gill's band on that particular tour. Because Mr. Gill's band was staying in the Canterbury Hotel, Ms. Martin had changed her clothes on the day of the concert in a room in the Canterbury Hotel and left a bag with her belongings at the front desk.
After the concert ended sometime after 12:30 a.m. on July 19, Ms. Martin and her two companions went to the backstage area of the Hoosier Dome in which Mr. Gill's bus was parked. When Mr. Gill's band was fully packed onto the bus, Ms. Martin said good-bye to her boyfriend and she and her companions left the Hoosier Dome. They went to Ms. Lawrence's Nissan 300ZX.
With Ms. Lawrence driving, the three women proceeded to the Canterbury Hotel, in order to pick up Ms. Martin's belongings. Ms. Martin sat crammed behind her two friends in the two-seat sports car. They arrived at the hotel at approximately 1:30 to 1:40 a.m. They pulled their car up next to the curb, just beyond the entrance to the semi-circular driveway of the hotel. Ms. Martin went inside to retrieve her bag, and Ms. Neal also entered the hotel in order to make a phone call.
Ms. Martin got her bag, exited the hotel, and sat down in the front passenger seat (since Ms. Neal had not yet emerged from the hotel). As Ms. Martin sat there, a limousine pulled slowly into the semi-circular driveway.

According to Tyson, "[i]f called to testi- fy, it is anticipated that" Martin[10] would

Ms. Martin looked at the limousine, was able to see through the tinted side windows in its backseat, and noticed a man and a woman hugging and kissing. Ms. Martin exclaimed to Ms. Lawrence that the two people were all over each other.

Ms. Martin then observed that people began to exit the limousine. The woman exited first, from the passenger door facing the hotel, and stepped back so that her upper body was visible to Ms. Martin above the trunk portion of the limousine. Ms. Martin noticed that she was a black woman with shoulder-length curly hair. The second person to emerge from the limousine was a husky black man with large glasses; he exited from the front passenger seat of the limousine. Then, the driver of the limousine, who was a black female with tinted hair, exited; she began to walk around to the passenger side of the limousine. The man who had been kissing in the backseat then exited the limousine, and Ms. Martin immediately recognized him as Mike Tyson. She noted that fact to Ms. Lawrence. Ms. Martin observed the woman move toward Mr. Tyson until their upper bodies appeared to be touching, and she appeared to put her arm in Mr. Tyson's.

Ms. Martin then observed Mr. Tyson and the woman enter the Canterbury Hotel, at about the same time that her third friend was leaving the hotel. Ms. Martin observed that Ms. Neal bumped into Mr. Tyson and the young woman.

\* \* \* \* \* \*

If called to testify,. it is anticipated that Carla J. Martin [sic] would testify as follows:

Ms. Lawrence attended the Johnny Gill concert on July 18, 1991 at the Hoosier Dome, with Ms. Martin and Ms. Neal. After the concert ended at approximately 1 [sic] a.m. on July 19, Ms. Lawrence accompanied Ms. Martin and Ms. Neal to the backstage area of the Hoosier Dome where Mr. Gill's tour bus was parked. Ms. Lawrence watched Ms. Martin say good-bye to her boyfriend, who played the drums in Mr. Gill's band, and then she, Ms. Martin, and Ms. Neal walked to Ms. Lawrence's red Nissan 300ZX, which was in an adjacent parking lot.

Ms. Lawrence then drove her car, with Ms. Martin sitting behind the two seats and Ms. Neal sitting in the passenger seat, to the Canterbury Hotel. Ms. Lawrence pulled her car up to the curb in front of the Canterbury Hotel, just beyond the entrance to the hotel's semi-circular driveway. Ms. Martin entered the hotel to pick something up, and Ms. Neal went into the hotel to make a telephone call.

As Ms. Martin exited the hotel and returned to the car, a large limousine pulled into the hotel's driveway. Ms. Lawrence heard Ms. Martin remark that the two people in the limousine were all over one another; Ms. Lawrence looked over and saw two persons sitting in the backseat of the limousine in close proximity to one another. One of the persons appeared to be a female with prominent hair.

Ms. Lawrence then observed a young black female emerge from the rear passenger-side door of the limousine. Ms. Lawrence observed that the woman had a prominent hair style of a kind not commonly seen among black women in Indiana. Then, Ms. Lawrence observed a black male exit from the rear passenger-side door of the limousine. Ms. Lawrence heard Ms. Martin say that the black male was Mike Tyson. Ms. Lawrence further observed a heavy-set black man in the vicinity of the limousine. Ms. Lawrence observed Mr. Tyson and the young black woman entered the hotel together.

\* \* \* \* \* \*

If called to testify, it is anticipated that Renee Neal would testify as follows:

Ms. Neal accompanied Ms. Martin and Ms. Lawrence to the Johnny Gill concert at the Hoosier Dome on July 18, 1991. The three women left the Hoosier Dome at approximately 1:30 to 1:45 a.m. on July 19. They drove to the Canterbury Hotel in Ms. Lawrence's red sports car, and Ms. Neal entered the hotel to make a phone call.

As Ms. Neal stood in the hotel parlor and made her call, she looked out the window and observed a gold limousine pull into the hotel's driveway. Ms. Neal observed that the limousine pulled up so close to the hotel that it appeared that it might come through the parlor window.

Ms. Neal then observed a black man and a thin black woman exit the limousine. As she was leaving the Canterbury Hotel, Ms. Neal observed the man and woman holding hands as they entered the hotel. Ms. Neal also observed a heavy-set black man with gold glasses standing near. the limousine as she left the hotel and returned to Ms. Lawrence's car. Record at 1189–93.

10. The record is devoid of any affidavit, deposition, or testimony from Martin, Lawrence, or Neal; rather, the written offer of proof filed with Tyson's Motion for Reconsideration contained statements of counsel that, "If called to testify, it is anticipated that" Carla J. Martin, Pamela Lawrence, and Renee Neal would testify in a particular manner. Record at 1189, 1192. In fact, the offer of proof recites the anticipated testimony of an individual identified as Carla J. Martin commencing on page 1 of the offer, Record at 1189; of an individual identified as Carla J. Martin commencing on page 3 of the offer, Record at 1191; and of an individual identified as Renee Neal at page 4 of the offer, Record at 1192. The assertion of Martin's anticipated testimony that appears at page 3 of the offer recites matters about which Martin could not have knowledge as, for example, statements about what Lawrence saw and heard and, ac-

testify that Martin and Lawrence were in a car parked in front of the Canterbury Hotel at approximately 1:40 a.m. on July 19, 1991, waiting for a friend, Renee Neal. Record at 1189–90. While there, Martin observed a limousine pull in front of the hotel. Martin saw "a man and a woman hugging and kissing" in the backseat of the limousine. *Id.* at 1190. The offer further states that it is anticipated that Martin would testify that she then observed an African–American woman with shoulder-length curly hair and Tyson, whom Martin immediately recognized, exit the backseat of the limousine and enter the hotel. As Tyson and the woman entered the hotel together, Martin saw Renee Neal, who was exiting the hotel, bump into the couple. Martin also observed that, as the couple entered the hotel, the woman "move[d] toward Mr. Tyson until their upper bodies appeared to be touching, and she appeared to put her arm in Mr. Tyson's." *Id.* at 1191. Martin also saw a husky African–American man with large glasses and an African–American woman with tinted hair exit the front of the limousine.

Tyson asserts that Lawrence, if called as a witness, would testify that she "saw two persons sitting in the backseat of the limousine in close proximity to one another." *Id.* at 1192. In her opinion, "[o]ne of the persons appeared to be a female with prominent hair." *Id.* She observed Tyson and the woman enter the hotel together. Neal's testimony would be that she "observed the man and woman [who had exited a gold limousine] holding hands as they entered the hotel." *Id.* at 1193.

D.W., on the other hand, testified that Tyson hugged and kissed her when she got into the limousine at her hotel but no further physical contact occurred in the limousine, and that she walked into his hotel behind him, not arm-in-arm or holding hands. Tyson testified that they were "kissing and touching" as they were driven in the limousine to his hotel; he did not describe their conduct upon their arrival at his hotel or as they walked into his hotel. *Id.* at 5019.

cordingly, we conclude the identity of the sec-

■ The dissent argues the excluded testimony "is different in kind and character from other evidence adduced at trial." Opinion at 304. It makes this statement based upon the conclusion that "the manner in which Tyson and D.W. acted toward each other shortly before the acts complained of has extreme relevance to whether or not Tyson might have reasonably believed, *from all the surrounding circumstances and events,* that D.W. consented even though as a factual matter she did not consent." *Id.* at 305 (emphasis in original). We most strongly disagree. Even as the dissenter acknowledges that this review "is not about whether Michael Tyson raped D.W. and/or perpetrated two sexual deviate acts upon her," *id.* at 301, neither is this review about whether Michael Tyson at some point reasonably and honestly believed that D.W. would consent to sexual conduct in the future if the opportunity presented itself. The evidence which the trial court excluded is relevant only to this non-issue. The record is replete with evidence from which a reasonable fact finder might reasonably conclude that Tyson had such a belief. However, an honest and reasonable belief that a member of the opposite sex will consent to sexual conduct at some point in the future is not a defense to rape or criminal deviate conduct. The only consent that is a defense is the consent that immediately precedes the sexual conduct; it is the defendant's honest and reasonable belief at that point in time, and not at any other point, that is relevant. Therefore, the trial court exercised sound discretion when it determined that the proffered testimony that Tyson and D.W. were "hugging and kissing" in the limousine and that they walked into the hotel hand-in-hand or arm-in-arm was not vital. Instead, it is appropriate to classify that evidence, as the trial court did, as "in the nature of" cumulative evidence, because, as stated above, the record is replete with evidence from which Tyson might have formed an honest and reasonable belief that D.W. would consent to sexual conduct at some point in the future.

ond purported declarant is, indeed, Lawrence.

However, we also recognize that the anticipated testimony of Martin would have contradicted the testimony of D.W. that there was no physical contact between her and Tyson after the limousine left her hotel. Nevertheless, as impeaching evidence, the excluded testimony is cumulative;[11] D.W. was impeached on other points, including the details of the rape. For example, fellow Miss Black America pageant contestant Madeline Whittington testified that D.W. told her she was going out with Tyson and stated, "This is Mike Tyson. He's got a lot of money. He's dumb. You see what Robin Givens got out of him." Record at 4591. D.W. denied making these comments and several similar comments about which other witnesses testified. *Id.* at 3355, 3357–58. Pasha Oliver, one of D.W.'s roommates during the pageant and a hostile witness for Tyson, testified that D.W. told her Tyson restrained her during the rape by pinning her wrists together and covering her mouth with his arm or hand, and that she asked Tyson to take her home after the rape and he refused, which made her angry. *Id.* at 5232. Again, D.W. expressly denied both of these things. *Id.* at 3323, 3356. Further, there was additional testimony that D.W. gave conflicting accounts of how the incidents in question occurred. *See* Appellant's Brief at 11–12 (summary of testimony of several pageant contestants regarding what D.W. told them about how the rape occurred).

In conclusion, the evidence of the conduct that occurred between Tyson and D.W. in the limousine before they entered the hotel and their conduct as they entered the hotel is not crucial considering the spectrum of evidence that corroborates the determination that Tyson reasonably and honestly believed D.W. would consent to sexual conduct in the future and the spectrum of impeaching evidence that was admitted during the course of the trial, including D.W.'s inconsistent descriptions of the critical details of the conduct that occurred in Tyson's hotel room. Therefore, the trial court did not abuse its discretion in determining that the testimony of Martin, Lawrence, and Neal was not vital to Tyson's defense.

### 3. *Remaining Wiseheart Factors*

In weighing the remaining *Wiseheart* factors, the trial court properly considered that because Tyson first disclosed the existence and identity of Martin, Lawrence, and Neal near the conclusion of the State's case-in-chief, those witnesses known to the State who were in a position to confirm or deny their anticipated testimony, that is, D.W., the Canterbury Hotel personnel, and the limousine driver, Virginia Foster, already had testified and been dismissed. The State asserts, "[o]bviously, had the State known before trial the substance of the new proposed witnesses' testimony, the prosecution would have restructured direct examination and secured additional witnesses to the facts alleged by the new witnesses." Appellee's Brief at 21. Presumably, contrary to Tyson's argument that the State would have had its witnesses lie, the State's argument is simply that the State would have been able to question its witnesses in its case-in-chief in more detail about such things as where Foster parked

---

11. In response to our discussion of the cumulativeness of the testimony of Martin, Lawrence, and Neal, the dissenter, based upon the testimony of Reverend Katherine Newlin, claims that "the excluded evidence ... thought by the majority to be cumulative, demonstrates that the jury was entitled to believe that there was consensual sexual contact in the hotel room.... At a very minimum [Newlin's] testimony gives rise to a strong and reasonable inference of consensual sexual contact in the hotel room. It is baffling indeed, therefore, that the majority proceeds to cavalierly discount the defendant's reasonable belief contention." Opinion at 305. Indeed, we are baffled how the dissent draws its conclusion. Rev. Newlin testified:

Q: [W]hat did [D.W.] tell you about the physical involvement that occurred between herself and Mr. Tyson?
A: What I recall—and again, it's not verbatim—I recall that there was some involvement but it got to a point where she said and indicated no more, and she was communicating to me that that's when it continued on.
Q: Did she tell you, Reverend Newlin, that there was physical involvement up to a point where she said no?
A: Not specifically. There was some sense of participation, but *she did not, as I recall, tell or communicate to me or did I hear in the room what that was or meant.*
Record at 4398 (emphasis added).

the limousine at Tyson's hotel, the lighting in the area, and whether there were other cars or people around. Instead, when Tyson cross-examined D.W., the limousine driver, and personnel from the Canterbury Hotel, only he was aware of the existence and purported testimony of Lawrence, Martin, and Neal. Thus, Tyson was able to elicit testimony from these witnesses without the State being aware of the significance of the testimony. Furthermore, in anticipation of the testimony of Lawrence, Martin, and Neal, and in order to avoid contradicting them, Tyson may have refrained from propounding questions on cross-examination which he otherwise would have asked.

Also, because the written offer of proof was not submitted until after the State had rested its case-in-chief, if the witnesses in question had been permitted to testify the State would have had to recall its dismissed witnesses on rebuttal. The trial court reasonably considered that the jury may not have accorded this evidence, presented on rebuttal, the same weight as it would have had it been presented during the State's case-in-chief.

The trial court also reasonably considered that, however limited the significance of their evidence might be, the anticipated testimony of Martin, Lawrence, and Neal would have required the State, in the exercise of "good lawyering," to identify, locate, and interview other witnesses, such as Martin's boyfriend, the drummer for Tyson's friend, Johnny Gill, and Tyson's girlfriend, Angela Boyd.[12] Then, arrangements would have had to be made to secure their testimony in person or by deposition. Of course, at that point, Tyson's counsel, also exercising "good lawyering," would also have needed to interview these witnesses. The trial court reasonably assumed that all of this effort to determine the accuracy of Martin, Lawrence, and Neal's recollection as to the date they observed Tyson and a woman in front of his hotel, and to determine the accuracy of the

observations that Tyson and a woman were hugging and kissing and walking hand-in-hand or arm-in-arm, could have resulted in a delay of several days, or perhaps a week or more. In considering these final *Wiseheart* factors, the trial court also reasonably considered the fact that the jury in this case was sequestered for the duration of the trial and that the alternative to excluding the proffered evidence, a continuance of several days and perhaps weeks, could have had an adverse impact upon the jury.

The circumstances of this case are closely analogous to those in *Shumaker v. State* (1988), Ind., 523 N.E.2d 1381, 1384. In *Shumaker*, the evidence "was largely cumulative of evidence offered by other defense witnesses regarding defendant's propensity for non-violence toward his wife." *Id.* Here, too, the evidence excluded would have been largely cumulative of other evidence impeaching D.W. and would have only corroborated Tyson's testimony that he believed D.W. would consent to sexual conduct at some future time, evidence that is irrelevant to the issue of whether she did in fact consent at the critical time. In *Shumaker*, our supreme court stated:

> While we agree that the extreme sanction of witness exclusion should rarely be imposed absent intentional concealment or substantial resulting prejudice, we cannot fault the trial judge for his imposition of the sanction in this case, given the nature and significance of the proposed testimony and the status of the trial at the time.

*Id.* Similarly, we conclude that we cannot fault the trial judge for excluding the anticipated testimony of Martin, Lawrence, and Neal, considering its nature and marginal relevance and the status of the trial at the time. There is no error.

## II.

Tyson argues that the trial court erroneously excluded evidence regarding incidents between D.W. and her parents which

---

**12.** This additional investigation would have been necessary as a result of evidence that Tyson was present early on another morning with

Angela Boyd in his limousine in front of his hotel.

allegedly would have shown that D.W. had a "powerful and secret motive" to fabricate the rape charge and would have exposed an alternative explanation for the psychological problems experienced by D.W. following the subject incident. Appellant's Brief at 47. He contends that excluding this evidence violated his rights under the confrontation clause and his right to present a defense.

Prior to the trial, the State filed a motion in limine to prohibit Tyson from referring to incidents between D.W. and her parents, and any counseling D.W. received in connection with those incidents. Tyson, who had previously filed a motion to admit evidence of D.W.'s alleged prior sexual conduct and an offer of proof regarding the incidents, Record at 862–68, objected to the State's motion. *Id.* at 1047–65. The trial court granted the State's motion and the evidence of the incident was not offered during the trial.

 A motion in limine serves to prevent the display of prejudicial material to the jury until the trial court has the opportunity to make an evidentiary ruling within the trial context. *Hadley v. State* (1986), Ind., 496 N.E.2d 67, 71. It is a temporary order and requires a party to notify the court when he or she intends to offer the evidence excluded by the order. *Davidson v. State* (1982), Ind., 442 N.E.2d 1076, 1078.

Merely challenging a trial court's ruling on a motion in limine fails to preserve any error for review. *Tyra v. State* (1987), Ind., 506 N.E.2d 1100, 1102; *Johnson v. State* (1985), Ind., 472 N.E.2d 892, 909. In order to raise the question of error, the information must be offered at trial to give the court an opportunity to determine its admissibility at that time. *See Tyra,* 506 N.E.2d at 1103; *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, 93, *cert. denied,* 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349 (1986).[13]

 As a defense witness, D.W.'s father, Donald Washington, was examined by trial counsel; D.W. and her mother, Mary Belle Washington, were fully cross-examined by trial counsel. Nevertheless, counsel failed either to seek leave to cross-examine D.W. and/or her mother on the subject-matter covered by the order in limine and/or to make an offer of proof during Tyson's direct examination of Donald Washington. By not following either procedure, Tyson has failed to preserve any error. The issue is waived.[14] *See Davidson,* 442 N.E.2d at 1078.

### III.

Tyson argues that the trial court erred by excluding all evidence of D.W.'s prior sexual conduct because the State "opened

---

**13.** Tyson asserts that a "tiny portion" of the information was erroneously excluded under rape shield concerns. Appellant's Brief at 47; *see* IC 35–37–4–4 (1988). However, like all evidence excluded under an order in limine, Tyson had the obligation to attempt to present evidence implicating the rape shield concerns so as to challenge the motion and allow the trial court to rule on the admissibility of the evidence within the context of the trial itself. *Trevino v. State* (1981), Ind.App., 428 N.E.2d 263, 268. He did not do so and thus has failed to preserve any error for our review.

**14.** Tyson raises three related points in his Reply Brief. First, he contends that the State is "estopped absolutely" from making a waiver argument because during the unrecorded conference regarding the State's motion in limine, Prosecutor Garrison "insisted that the issue was preserved for appellate purposes without it being revisited during the trial." Appellant's Reply Brief at 21 (footnote omitted). This argument is without merit; the statement is a legal opinion upon which Tyson's counsel reasonably could not rely.

Second, he argues that his pre-trial offer of proof, pursuant to his IC 35–37–4–4 motion concerning the rape shield exception, was sufficient to preserve this issue for appeal. This is not correct. Only an offer of proof presented during trial preserves an error for our review. *See Tyra,* 506 N.E.2d at 1103.

Finally, although Judge Gifford granted a joint motion to file the original depositions of D.W. and her parents which allegedly contain references to the incidents, the depositions were neither offered nor admitted into evidence at trial. *See* Record at 1042, 1105; *see also id.* at 3092 (defense counsel Vincent Fuller stating during trial that D.W.'s deposition was not part of the record). Thus, Tyson's citations to the "Dep. of [D.W.], Dec. 20–21, 1991, Defendant's Ex. 12" and "Dep. of Mary Belle Washington, Dec. 6, 1991," Appellant's Brief at 17, 52 n. 59, items outside of the record, are unavailing.

the door" by making "an all out effort to portray [D.W.] as a paragon of innocence and virtue ... culminating in a suggestion ... that [D.W.] had been a virgin when she arrived in Indianapolis." Appellant's Brief at 52. Prior to trial, Tyson filed a motion and supporting memorandum to allow reference to D.W.'s alleged prior sexual conduct if the State referred to D.W.'s adherence to Christian principles, her lack of sexual experience, or her lack of receptiveness to sexual relations. Record at 849–64. The State opposed this motion and the trial court denied it. *Id.* at 1104.

Tyson claims that the State's examination of D.W., as well as its opening and closing arguments, left the jury with the impression that D.W. was a "sexual innocent whose religious beliefs prohibited any premarital sex and who was far too naive to understand the implications of going to Tyson's hotel room in the middle of the night," Appellant's Brief at 18, and he should have been able to challenge this impression by cross-examining her about her sexual history. However, again Tyson failed to preserve the pre-trial ruling by the trial court by asking leave of court to cross-examine D.W. on the subject, and thus this issue is not before this court.[15]

## IV.

Tyson argues that the trial court erred in admitting an audio tape of a telephone call that D.W. placed to 911 approximately twenty-four hours after Tyson raped her. He objected to the use of the tape because it was prejudicial and a prior statement inadmissible under *Modesitt v. State* (1991), Ind., 578 N.E.2d 649.

In *Modesitt,* our supreme court, adopting Fed.R.Evid. 801(d)(1)(B), held that

a prior statement is admissible as substantive evidence only if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

*Id.* at 653–54. Tyson correctly states that *Modesitt* and Rule 801 recognize that customarily a witness's prior consistent statement cannot corroborate her in-court testimony because, standing alone, a prior statement has little, if any, probative value. The State argues, however, that the tape is admissible under *Modesitt* because it rebuts the defense's allegations that D.W. fabricated her charge of rape and had improper motives in accusing Tyson.

The admitted tape is consistent with D.W.'s in-court testimony. It does not contain any statements which rebut Tyson's allegation of fabrication or improper

---

**15.** Assuming that the error was properly preserved for review, the trial court did not abuse its discretion when it excluded evidence of D.W.'s alleged prior sexual conduct. Under IC 35–37–4–4, evidence of an alleged victim's sexual history is generally inadmissible in the trial of the alleged offender. *Kelly v. State* (1992), Ind.App., 586 N.E.2d 927, 929, *trans. denied.* The statute was enacted to prevent a general inquiry into the past sexual conduct of the victim in order to avoid "embarrassing the victim and subjecting her to possible public denigration." *See Thomas v. State* (1984), Ind., 471 N.E.2d 681, 683.

Tyson cites to portions of D.W.'s testimony which he asserts created an impression of innocence, including that she was active in her church, a doer of good deeds, and an award-winning student. He contends that the State's characterization of D.W. during opening and closing arguments as a "kid" with "eyes this big" who put on her "jammies" before bed and who expected to go home "the same girl" after her date with Tyson further enhanced this image. Appellant's Brief at 19. Tyson argues he should have been permitted to impeach this "angelic image" by cross-examining her about her prior sexual conduct. *Id.*

Cross-examining D.W. about her prior sexual conduct in this case falls squarely within the terms of the rape shield statute. Assuming the testimony has some probative value in aid of the theory that D.W. was not as sexually innocent as Tyson argues the State suggested, "the legislature has made the determination that evidence of prior sexual history, though arguably relevant to issues such as consent [or witness credibility], is not admissible except for three strictly limited purposes." *Kelly,* 586 N.E.2d at 929; *see* IC 35–37–4–4(b)(1), (2), & (3). The cross-examination testimony which Tyson wished to elicit does not fall into any of these three exceptions, and "we may not graft additional exceptions onto the statute." *Kelly,* 586 N.E.2d at 929. It was thus inadmissible under the rape shield statute, and properly excluded by the trial court.

motive which were not obtained by direct or cross-examination. Thus, the tape contains merely cumulative evidence and its admission could, at most, constitute harmless error.[16] The admission of cumulative evidence is not prejudicial and by itself is not grounds for reversal. *Miller v. State* (1989), Ind., 541 N.E.2d 260, 262; *see also McCollum v. State* (1991), Ind., 582 N.E.2d 804, 812 (admission of audio tape containing cumulative information not sufficiently prejudicial as to require reversal); *Hennings v. State* (1989), Ind., 532 N.E.2d 614, 615 (any error in admitting recording of victim's highly emotional call made immediately after rape was cumulative of victim's testimony and therefore harmless).

## V.

■ During closing argument, the prosecutor read a passage from Justice White's partial dissent in *United States v. Wade* (1967), 388 U.S. 218, 256–57, 87 S.Ct. 1926, 1947–48, 18 L.Ed.2d 1149, in which Justice White expounds on the respective roles of defense counsel and the prosecutor in a criminal trial. When the prosecutor told the jury he was going to read from "a landmark case" from the United States Supreme Court, Tyson's counsel objected, stating, "Your Honor, I object to Mr. Garrison reading case law to the jury. I believe that's in the Court's province, not Mr. Garrison's." Record at 5500. The court overruled the objection, and the prosecutor proceeded to read from Justice White's opinion at some length. On appeal, Tyson argues it was error to allow this passage to be read because it was "a prejudicial, irrelevant, and secretly edited [17] excerpt from Justice White's dated dissenting opinion," Appellant's Brief at 55 (footnote added), which "never was and is clearly not today the law," Appellant's Reply Brief at 26.

■ This issue is not properly before us for review for two reasons. First, Tyson objected only to the prosecutor reading case law in general; he did not make a specific objection to the particular case, that is, his only objection was made before counsel began reading from *Wade*, and thus could not have possibly addressed the substance of what was read. "The grounds for objection on appeal must be

**16.** The parties urge this court to interpret the term "recent fabrication," and offer a plethora of federal cases and cases from other states. However, because the erroneously admitted tape contained only cumulative evidence, we do not address any temporal requirement for admissibility.

**17.** Tyson's appellate counsel asserts that the prosecutor omitted a sentence from the passage he read, and claims that he "deliberately and secretly omit[ted] the most crucial sentence from the quoted paragraph" to Tyson's detriment. Appellant's Brief at 57. The prosecutor read the following passage:

Law enforcement officers have the obligation to convict the guilty and to make sure that they do not convict the innocent. They must be dedicated to making the criminal trial a procedure for the ascertainment of the true facts surrounding the commission of a crime. To this extent our so-called adversary system is not adversary at all, nor should it be. But defense counsel has no comparable obligation to ascertain or present the truth. Our system assigns him a different mission. He must be and is interested in preventing the conviction of the innocent, but absent a voluntary plea of guilty, we also insist that he defend his client whether he is innocent or guilty. The State has the obligation to present the evidence.

The defense counsel needs to present nothing, even if he knows what the truth is. He need not furnish any witness to the police or reveal any confidence of his client or furnish any other information to help the prosecution's case. If he can confuse a witness, even a truthful one, or make him appear at a disadvantage, unsure, or indecisive, that will be his normal course. Our interest in not convicting the innocent permits counsel to put the State to its proof, to put the State's case in worse [sic] possible light regardless of what he thinks or knows to be the truth. In this respect, as part of our modified adversary system and as part of the duty imposed upon honorable defense counsel, we countenance or require conduct which in many instances has little, if any, relationship to the search for the truth.

Record at 5501–02. The sentence omitted by the prosecutor reads: "Undoubtedly there are some limits which defense counsel must observe but more often than not, defense counsel will cross-examine a prosecution witness, and impeach him if he can, even if he thinks the witness is telling the truth, just as he will attempt to destroy a witness who he thinks is lying." *See Wade,* 388 U.S. at 257, 87 S.Ct. at 1948. We are unclear how Tyson was prejudiced by the omission of this sentence which impugns the conduct of defense counsel.

the same as those made at trial and any grounds not raised in the trial court are not available on appeal." *Fozzard v. State* (1988), Ind., 518 N.E.2d 789, 792 (citation omitted); *Wright v. State* (1992), Ind., 593 N.E.2d 1192, 1194, *cert. denied,* —— U.S. ——, 113 S.Ct. 605, 121 L.Ed.2d 540 (1992). While Tyson's trial counsel could not have been expected to be "a walking encyclopedia who had committed the *Wade* opinion to memory, so that he could instantly know that the prosecutor not only misstated when he said he was reading from the 'law,' and from a 'concurring opinion,' ... but also know that the State was editing out key portions of the excerpt," Appellant's Reply Brief at 27, it is reasonable to expect counsel to make a specific objection after it was apparent, by inquiry if necessary, from which case the prosecutor was reading. In particular, counsel may be expected to listen to what is read and object if he or she feels it is prejudicial to his or her client. Thus, Tyson's failure to object to the reading from *Wade* in particular, rather than to the reading of law, in general, constitutes waiver of this issue.[18]

### VI.

Tyson argues the trial court committed reversible error when it refused to give his Tendered Instructions Nos. 5 and 6, both of which deal with Tyson's belief regarding D.W.'s consent to sexual acts. The instructions in question read as follow:

Tendered Instruction No. 5:

Before you may return a conviction on any count, you must be satisfied that the State has proved beyond a reasonable doubt that the defendant knowingly forced the complainant to engage in the sexual acts charged. This means that the State must prove beyond a reasonable doubt that the complainant did not consent and, in addition, that the defendant did not reasonably believe that she had consented.

Tendered Instruction No. 6:

The defense of mistake of fact is defined by law as follows: It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the culpability required for the commission of the offense. The reasonable mistake about a fact must have prevented the defendant from acting intentionally or knowingly as those terms are defined by law. In this case, it is a defense to all the charges that the defendant was reasonably mistaken about whether the complainant consented to the sexual acts in question. The State has the burden of disproving this defense beyond a reasonable doubt.

Record at 1235–36. Although we recognize the implicit differences between "reasonable belief" and the "defense" of mistake of fact, we consider the tendered instructions together because, as Tyson notes, "[f]or purposes of this case, there is no significant difference between the defenses of mistake of fact and reasonable belief as to consent. Both require the defendant

---

18. In addition to making an insufficient objection, Tyson failed to properly preserve this issue because he failed to ask for an admonition and mistrial.

> [W]hen an improper argument is alleged to have been made the correct procedure is to request the trial court to admonish the jury. If the party is not satisfied with the admonishment, the correct procedure is to make a motion for a mistrial. Failure to request an admonishment or move for a mistrial results in waiver of the issue of improper argument.

*Brewer v. State* (1993), Ind., 605 N.E.2d 181, 182 (citations omitted); *see also Dresser v. State* (1983), Ind., 454 N.E.2d 406, 407.

Tyson's appellate counsel argues that trial counsel did not request an admonishment or mistrial because to do so after the court had

overruled his objection "would have been to become a 'chattering magpie.'" Appellant's Reply Brief at 27 (citing *United States v. Kelinson* (1953), 2d Cir., 205 F.2d 600, 602). The Indiana supreme court rejected this argument in *Dresser,* 454 N.E.2d at 407 ("We acknowledge that the court overruled the objections that were made, which strongly indicates that such motions [for admonishment and mistrial] addressed to the objections would also have been overruled. Nevertheless, the objections made and rulings thereon preserved nothing for appellate review."), and reaffirmed its position just this year in *Brewer,* 605 N.E.2d at 182–83 (failure to move for admonishment or mistrial waived issue of alleged improper use of *Wade* opinion in closing argument, even though appellant's objection was overruled).

reasonably believe the complainant consented to sex." Appellant's Brief at 39 n. 41.

■■■■ Jury instructions lie largely within the sound discretion of the trial court and are reviewed only for an abuse of that discretion. *Woods v. State* (1992), Ind.App., 587 N.E.2d 718, 722, *trans. denied; Crabtree v. State* (1989), Ind.App., 547 N.E.2d 286, 292, *trans. denied.* When the trial court refuses to give an instruction, we must determine whether the tendered instruction correctly states the law, whether there is evidence in the record to support the giving of the instruction, and whether the substance of the tendered instruction is covered by instructions which were given by the trial court. *Crabtree,* 547 N.E.2d at 292; *see also Aschliman v. State* (1992), Ind., 589 N.E.2d 1160, 1162.

■■■ Assuming that Tendered Instructions Nos. 5 and 6 correctly state the law in Indiana,[19] the instructions do not meet the

19. Although not argued by the State on appeal, a credible argument can be made that the tendered instructions do not correctly state the law in Indiana because they incorrectly focus on Tyson's perception of D.W.'s consent.

The culpability required for the commission of an offense is defined in IC 35–41–2–2(d) (1988) which provides: "Unless the statute defining the offense provides otherwise, if a kind of culpability is required for commission of an offense, it is required with respect to every material element of the prohibited conduct." Thus, unlike the Model Penal Code, which requires culpability with respect to every material element of the offense, the Indiana Criminal Code requires culpability only with respect to the prohibited conduct. *Compare Rose v. State* (1982), Ind.App., 431 N.E.2d 521, 524 n. 1 and *Markley v. State* (1981), Ind.App., 421 N.E.2d 20, 21 with Model Penal Code § 2.02(4) (1962) ("When the law defining an offense prescribes the kind of culpability that is sufficient for the commission of an offense, without distinguishing among the material elements thereof, such provision shall apply to all the material elements of the offense, unless a contrary purpose plainly appears."). This distinction was emphasized by the amendment to the culpability statute which occurred in 1977. A prior version of IC 35–41–2–2(d) required culpability with respect to material elements of "prohibited conduct and its attendant circumstances." IC 35–41–2–2(d) (1976). By deleting the phrase "and its attendant circumstances," the legislature expressed its intent to limit the culpability requirement to prohibited conduct only. *Markley,* 421 N.E.2d at 21 ("If the legislature had intended culpability to apply to every material element, the phrase 'of the prohibited conduct' would be superfluous.").

The significance of the fact that culpability is not required for attendant circumstances is illustrated by the statutory definition of the mistake of fact defense. IC 35–41–3–7 (1988) defines the defense as follows: "It is a defense that the person who engaged in the prohibited conduct was reasonably mistaken about a matter of fact, if the mistake negates the *culpability* required for commission of the offense." (emphasis added). Thus, an alleged mistake of fact with reference to an attendant circumstance for which there is no culpability required is not within the parameters of the defense.

To determine if the defense is available, therefore, the elements of a statute must be broken down into those of prohibited conduct and those of attendant circumstances. In rape, for example, the statute provides in relevant part: "A person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when ... the other person is compelled by force or imminent threat of force ... commits rape." IC 35–42–4–1 (1992 Supp.) The prohibited conduct in the offense of rape is sexual intercourse with a member of the opposite sex by force or imminent threat of force. Compulsion of the victim, while an element of the offense, is an attendant circumstance, not prohibited conduct. Similar treatment could be given to the offense of criminal deviate conduct. Because culpability is not required as to attendant circumstances, and the mistake of fact defense is available only as to prohibited conduct which requires culpability, evidence that the defendant reasonably believed that the alleged victim consented to the sexual conduct is irrelevant.

Of course, although lack of consent is not an element of rape or criminal deviate conduct *per se,* evidence which has a tendency to prove either consent or lack of consent is relevant to the element of compulsion, which exists in both offenses. Evidence that the alleged victim consented to the sexual act is evidence that negates compulsion, while evidence that the alleged victim did not consent may be evidence that the victim was compelled.

Arguably, then, in order to raise the defense of mistake of fact in a rape or criminal deviate conduct case, there must be evidence that suggests the defendant was reasonably mistaken as to whether a sexual act occurred or whether force or threatened force was used, the prohibited conduct components of the offenses. Evidence that the sexual act or force or threat of force did not occur cannot raise a mistake of fact "defense" because that evidence denies the prohibited conduct, and there cannot have been a mistake about conduct which did not occur. For example, Tyson testified that he did not, at any time, force D.W. to engage in sexual con-

second prong of the test, that is, there is no evidence in the record from which a reasonable juror could conclude that Tyson reasonably believed D.W. consented to the sexual conduct.

Indiana has long recognized that an honest and reasonable mistake concerning a fact excuses criminal conduct which would not be criminal if the fact had been as the defendant reasonably believed. *Davis v. State* (1976), 265 Ind. 476, 478, 355 N.E.2d 836, 838; *Noble v. State* (1967), 248 Ind. 101, 105, 223 N.E.2d 755, 758; *Squire v. State* (1874), 46 Ind. 459, 461. "Honesty is a subjective test dealing with what [the defendant] actually believed. Reasonableness is an objective test inquiring what a reasonable man situated in similar circumstances would do. To require the giving of [the defendant's] instruction, we must find some evidence of both." *Davis*, 265 Ind. at 481, 355 N.E.2d at 839; *see also Woods v. State* (1992), Ind.App., 587 N.E.2d 718, 723, *trans. denied* (An instruction which defines mistake of fact as a defense with three elements, one of which is that the mistake must be subjectively honest and objectively reasonable, clarifies the defense for the jury.).[20]

Thus, if the State presents a prima facie case of guilt, the defendant has the burden of going forward with an evidentiary basis for his mistaken belief of fact which could create a reasonable doubt in the jury's mind that he acted without the requisite mental state. *Hoskins v. State* (1990), Ind., 563 N.E.2d 571, 575; *Stoner v. State* (1982), Ind., 442 N.E.2d 983, 985. Requiring a defendant to establish an evidentiary basis does not shift the burden of proof; the State retains the ultimate burden of proving beyond a reasonable doubt every element of the charged crime, including culpability, which must entail proof that there was no reasonably held mistaken belief of fact. *Hoskins*, 563 N.E.2d at 576.

Tyson asserts that his testimony provides ample evidence to support Tendered Instructions Nos. 5 and 6. During direct examination, Tyson testified that "I believe that we had both made it clear earlier that day what was going to happen, and that she came to my room at 2 o'clock in the morning. I'm sure we made it clear,"[21] Record at 5078; that D.W. responded in a positive manner to his kissing in the limousine while riding to his hotel, *id.* at 5019; and that while he was kissing her in the hotel room she was "dropping her jacket, you know, getting her jacket off quick," *id.* at 5023. He also testified that he complied with D.W.'s request not to ejaculate in her and that he asked her to stay the night.

Assuming Tyson's assertions, that he believed he and D.W. "made it clear" earlier in the day that they were going to have sexual intercourse and that, after the sexual conduct occurred, he asked her to spend the night with him, provide some evidence that he honestly believed D.W. consented to sexual intercourse, the assertions are not evidence of the reasonableness of that belief. *See Davis*, 265 Ind. at 481, 355 N.E.2d at 839. To determine whether there is evidence that Tyson's assumed belief was reasonable, we look to his description of the encounter:

Q.: Did you undress her?

A.: I did.

　　＊　　＊　　＊　　＊　　＊　　＊

Q.: What happened then, Mr. Tyson?

A.: As I'm kissing her, she's moving fast. I'm kissing her. She dropping

---

duct. Record at 5032 ("I did not violate her in any way."). Accordingly, he neither argues that he was reasonably mistaken as to the occurrence of sexual conduct or as to his use of force, nor does he claim that evidence of such a mistake was presented. Instead, he claims he was reasonably mistaken as to D.W.'s consent, a mistake which, arguably, is not a defense to rape or criminal deviate conduct.

**20.** The dissent makes "much ado about nothing," that is, that a mistake of fact instruction

was given in *Woods*. In *Woods*, the propriety of an instruction on the defense was not an issue because both the State and the defendant tendered a mistake of fact instruction. Thus, *Woods* is not authority for the proposition that a mistake of fact instruction is always appropriate if consent is an issue.

**21.** Tyson testified that earlier in the day, soon after he had met D.W., he explained to her "That I wanted to fuck her," and she responded, "Sure, just give me a call." Record at 5000.

[sic] her jacket.... I'm kissing on her neck and I'm kissing her around the ears, the back of her neck, her chest, her nipples, her stomach, and I believe she had a white shirt on as well. She's trying to get that off. So I came back while she was taking it off and she had taken off those shorts—she had some shorts. She took off her shorts. I took my shirt off at the time. She had took [sic] off her underwear and the underwear dropped to her knees, and I pulled the underwears [sic] off, and then I took off—I had shorts that I had took off [sic]. I continued kissing on her body.

Q.: Then what happened?

 \* \* \* \* \* \*

A.: We were having oral sex a little while, and she had told me to stop, and she had told me to come up, come up. She said, "No, come up."

Q.: Meaning what?

A.: Indicating that she wanted me to insert my penis in her.

 \* \* \* \* \* \*

Q.: And what did you do then?

A.: She had told me not to come in her. She said, "Don't come in me, don't come in me. I'm not on the pill," and I pulled back and I ejaculated on her stomach and her leg.

Record at 5023–24.

Tyson's description is a plain assertion of actual consent. From this testimony, a reasonable jury could infer only that D.W. actually consented to sexual intercourse. There is no recitation of equivocal[22] conduct by D.W. which reasonably could have led Tyson to believe that D.W. only appeared to consent to the charged sexual conduct; no gray area exists from which Tyson can logically argue that he misunderstood D.W.'s actions. According to Tyson, he exerted no force and D.W. offered no resistance; instead, she was an active and equal participant in the conduct. While this testimony would negate an element of the crime—that Tyson forcibly engaged in sexual conduct with D.W.—and challenges D.W.'s credibility, it does not support the giving of a mistake of fact instruction.[23]

Tyson further argues that "many of the statements [D.W.] admitted she had made to [Tyson] during the sexual conduct itself were consistent with a reasonable belief on his part that the sex was consensual." Appellant's Brief at 44. Specifically, D.W. testified that when Tyson saw she was crying during the rape and after the two acts of criminal deviate conduct, he asked if she wanted to "get on top," to which she responded in the affirmative without "then explaining to him that she agreed to go on top only because she thought it would enable her to get away," id.; and that she asked Tyson to, "Please put a condom on"[24] and said, "I don't need a baby," Record at 3151. Tyson argues that "[a] properly instructed jury could have found (or entertained a reasonable doubt) that these exchanges could have led a reasonable person to believe that [D.W.] consented, even if in her own mind she may not have been consenting." Appellant's Brief at 44. However, in the context in which these statements occurred, that is, amidst D.W.'s unequivocal description of a sexual assault, they could not, as a matter of law, lead a reasonable person to believe that

---

**22.** Equivocal is defined as "having two or more significations: capable of more than one interpretation: of doubtful meaning: ambiguous." Webster's Third New International Dictionary 769 (1976).

**23.** Tyson's testimony that he complied with D.W.'s request not to ejaculate in her is not relevant to this issue, as it does not tend to prove he believed that she consented to the sexual conduct immediately preceding its occurrence.

**24.** This statement, by itself, does not reasonably support the inference that D.W. consented to sexual intercourse. However, D.W.'s request, along with Tyson's response, that he would prefer to "ejaculate[ ] on her stomach and leg," Record at 5024, and Tyson's after-intercourse statements—"I told you I wouldn't come in you. Don't you love me now?" id. at 3153—suggest only the inference that Tyson was aware that D.W. did not consent to unprotected sexual intercourse.

Tyson was reasonably mistaken as to D.W.'s consent to sexual intercourse.[25] Further, these statements all occurred after the criminal deviate conduct took place; therefore, they could not support a mistake

of fact defense to the criminal deviate conduct counts.

As Tyson argues, "as a matter of Indiana law, he is entitled to have the jury consider *all* available testimony in order to

---

25. D.W. testified on direct examination:

A.: I walked out of the room, out of the bathroom ... and then I glanced over and I saw the Defendant in his underwear....
Q.: What was your reaction?
A.: I was terrified.
Q.: What did you say?
A.: "It's time for me to leave."
Q.: Like that?
A.: Yeah.
Q.: And his response?
A.: "Come here." And he grabbed my arm, and then he was, like, "Don't fight me. Come here," and then he stuck his tongue in my mouth.

\* \* \* \* \* \*

Q.: What did you do?
A.: Just pulled back.... He started saying, "Don't fight me." I tried to fight him.... It was like hitting a wall. It didn't do anything.
Q.: What did he do next?
A.: He started taking off that outer jacket that I had on. He started taking that off, and I'm like, "Get off me. Stop. Get off me," and he just kept going. Then the next thing I knew, he put me down on the bed or slammed me actually down on the bed, and he started grabbing the rest of the stuff down, and he kept kissing me and kept saying, "Don't fight me, don't fight me, relax, don't fight me."

\* \* \* \* \* \*

Q.: Did you try to negotiate with him?
A.: Yeah. That was after he put his hands in me, his fingers, in my vagina.
Q.: Okay, How did he get his hand down there?
A.: He was between my legs, and he just put his fingers in there, started jamming them in really, really hard, and that's when tears started to come to my eyes, and I was, like, "Owww, please, stop."

\* \* \* \* \* \*

Q.: Did you mention to him that you were worried about pregnancy?
A.: Yeah. That was—he started to pull out his penis, and he was over me, and I just freaked out and I started saying anything because I knew that hitting him and stuff wasn't going to help me. So, I just started saying anything that I could think of, like, "Please, I have a future ahead of me. Please, I have college. I can't have a baby. What are you doing?" You know, "Please put a condom on." I was just—anything to get him off of me so that I could get out of there, and he was just, like, "Well, I don't have anything and I know that you don't." I'm like, "Please, I don't need a baby. I don't need a baby." I

was begging him. I was saying anything that I could say to him, and nothing worked. He was just, like, "So we'll have a baby," and he just jammed himself in me.... [H]e exposed his penis.
Q.: What did he do then?
A.: He jammed it in my vagina.
Q.: What did you do?
A.: I screamed out—not screamed, but I was like, "Owww," and then I just started crying and I—
Q.: Pain again?
A.: Yes.
Q.: Did you tell him you hurt?
A.: Yes.... It was just excruciating. It just hurt. He just slammed himself in me. It just felt like someone was ripping me apart. I don't know how to explain it. It just hurt.
Q.: Okay. What efforts, if any, did you make to try to get loose, to try to get away?
A.: I was trying to punch him and stuff like that. I was trying to back up. I was trying to do a lot of things. Nothing worked.
Q.: Okay. What's he doing while you're trying to do all this?
A.: He was telling me not to fight him, and then he started saying, "Don't fight me, mommy. Don't fight me," and he just kept going. He just kept slamming himself really hard.

\* \* \* \* \* \*

Q.: Did you change position?
A.: At one point, he said, "Oh, you're crying," and he stopped for a second and his voice started to, like, be a little bit normal again, and then he just turned evil again, and really mean, and his eyes got all mean, and he just kept going really hard, and then he goes, like, "Well, do you want to be on top?" and I thought I could get away. So I said, "Yeah," and I was crying when I said it, and he flipped over. Then I tried to get away, and he was, like, "I told you not to fight me," and he slammed me back down again and rolled back over again.
Q.: Okay. Do you have any idea as to how long he remained inside of you?
A.: Until he was done.... Until he ejaculated.
Q.: Did you see him do that?
A.: Yes.
Q.: Tell us what he did.
A.: He pulled back and there was stuff coming out, and he said, "I told you I wouldn't come in you. Don't you love me now."
Q.: He said, "Don't you love me now?" and what was your response?
A.: I just looked at him like I was disgusted.

Record at 3144–53.

determine whether he actually and reasonably mistook [D.W.'s] words and conduct to communicate her consent." Appellant's Reply Brief at 19 n. 34 (emphasis in original). However, an examination of the testimony of D.W. and Tyson, the only testimony available as to the events in the hotel room, reveals evidence of only consent or compulsion; there is no evidence of equivocal conduct that a reasonable person in Tyson's position could have reasonably misinterpreted as D.W.'s consent to the charged sexual conduct.

Tyson asks us to consider that D.W. "met Tyson later, under circumstances which suggested an interest in sex—she accepted an invitation at 1:40 A.M., voluntarily accompanied Tyson to his hotel room, and willingly sat on his bed with him." Appellant's Brief at 44. This conduct may support a determination that a reasonable person in Tyson's position reasonably could have believed D.W. would at some point be willing to consent to sexual conduct; it also is consistent with Tyson's testimony of consensual sexual conduct. However, considering D.W.'s testimony of unequivocal compulsion at the time the sexual conduct occurred, her willingness to meet him and her alleged "interest in sex" does not support the determination that a reasonable person in Tyson's position reasonably, but mistakenly, could have believed that D.W. consented to sexual conduct at the pertinent time—immediately preceding the sexual conduct.

Tyson testified to one set of events, D.W. to another. Tyson's testimony compels the conclusion that D.W. unequivocally gave her actual consent to sexual conduct and participated in it; D.W.'s testimony compels the conclusion that Tyson forcibly performed sexual conduct upon her. Thus, neither witness's testimony provides the basis for a reasonable mistake because neither testimony contains equivocal conduct which reasonably could have been misunderstood by Tyson.

Neither is there conflicting testimony which could be harmonized so as to support a mistake of fact instruction; D.W. and Tyson did not testify to different interpretations or perceptions of basically uncontroverted conduct. Their respective testimonies describe two different and irreconcilable events that cannot be harmonized and taken together to provide evidentiary support for the instruction in question.[26]

 "In spite of our preference to leave determinations of reasonableness to the jury, which embodies the values of the community, we find no evidence here from which the jury could have determined that [Tyson's] belief was reasonable," as required by Indiana law.[27] *Davis*, 265 Ind. at 481, 355 N.E.2d at 840.

---

**26.** Tyson argues that a "properly instructed jury might well have concluded that the truth of what occurred in the hotel room lay *somewhere between* Washington's inculpatory account and Tyson's exculpatory one." Appellant's Brief at 46 (emphasis in original). This, however, is not a criteria for our review of a tendered instruction; rather, we review the record to see if the evidence presented could support the instruction.

**27.** The dissent cites *People v. Burnham* (1986), 176 Cal.App.3d 1134, 222 Cal.Rptr. 630, *rev. denied*, in which the California Court of Appeals states that whenever a defendant testifies to the complainant's unequivocal consent to sexual conduct he also triggers the "defense of a bona fide belief in the victim's consent" and a mistake of fact instruction is required. *Id.* at 1148, 222 Cal.Rptr. at 641 (citations omitted). Thus, under *Burnham*, as long as a defendant expresses his subjective belief that the victim consented, a mistake of fact instruction is warranted whether

or not that belief was reasonable. This view is not uniformly held in other jurisdictions. In Indiana, evidence from which a reasonable jury could find both an honest and reasonable belief on the part of the defendant is required before a mistake of fact instruction may be given. *Davis*, 265 Ind. at 479, 355 N.E.2d at 839. Evidence of actual consent alone does not trigger the instruction regarding mistake of fact. The dissent suggests nothing more than that we (1) modify Indiana law requiring evidence of objective reasonableness by deleting that requirement, or (2) require such a minimal showing of objective reasonableness as to, in essence, require nothing more than a subjective belief of consent.

The dissenter's statement that "[r]efusal to give the instruction upon grounds that no reasonable person would have interpreted the evidence to indicate the victim's consent impermissibly invades the jury's province" is in error. Opinion at 307. As stated, there must be evidence in the record of an honest and reasonable

In contrast, the trial court's instructions to the jury were accurate. The trial court gave Final Instruction No. 19, which articulates the elements of the crime of rape, including "the State must have proved ... [Tyson] ... knowingly or intentionally ... had sexual intercourse with [D.W.] when ... [D.W.] was compelled by force or imminent threat of force," Record at 1262, and Final Instruction No. 21, which articulates the elements of deviate sexual conduct in the same way. It also gave Final Instruction No. 18, which defines the terms intentionally and knowingly. *Id.* at 1261. These instructions properly instructed the jury regarding the culpability required for the offenses with which Tyson was charged, and properly focused the jury on the task of determining whether the State proved beyond a reasonable doubt that Tyson knowingly or intentionally used force to have sexual conduct with D.W. when D.W. was compelled by the force. The trial court did not err in refusing Tyson's Tendered Instructions Nos. 5 and 6.

### VII.

Tyson argues the trial court erroneously excluded his Tendered Final Instruction No. 1, which reads:

> While the jury is the judge of the facts, I am the judge of the law. You must accept my instructions as to the law that governs this case, and then apply that law to the facts as you find them.

Record at 1231. The instruction was properly excluded.

Tyson frames this issue as:

> The court then refused to give an instruction proffered by the defense that would have properly informed the jury of its role under Indiana law: "you must accept my instructions as to the law that governs this case, and then apply that law to the facts as you find them." (R.1231) Refusal to give this instruction was error.

Appellant's Brief at 59. Throughout his argument, Tyson discusses the omitted instruction as if it were tendered without the first sentence; in fact, the first sentence does not appear anywhere in either Tyson's initial brief or his reply brief.[28] Tyson's argument is therefore not related to the instruction as it was tendered and refused, and he fails to present an issue in this regard for our review. *See* Ind.Appellate Rule 8.3(A)(7) ("When error is predicated on the giving or refusing of any instruction, the instruction shall be set out verbatim in the argument section of the brief with the verbatim objections, if any, made thereto."); *Taylor v. State* (1992), Ind., 587 N.E.2d 1293, 1303; *Norris v. State* (1986), Ind., 498 N.E.2d 1203, 1206.[29] We will, however, as did the court in *Taylor*, examine the argument as presented.

As stated *supra*, when reviewing the refusal of a tendered instruction, we must determine whether the instruction

---

mistake of fact in order to require the giving of a mistake of fact instruction. Thus, our review of the evidence necessarily includes a determination of whether a reasonable person in the appellant's position could have interpreted the complainant's actions as indicating consent to the sexual conduct. This court has historically applied this standard in determining whether a trial court erred in refusing to give a requested instruction. *See, e.g., Davis,* 355 N.E.2d at 839. Our analysis of the evidence differs from the jury's because we must determine whether as a matter of law the evidence of record supports the giving of a mistake of fact instruction. We do not ask, as the jury would if an instruction were warranted, whether, in fact, the defendant was honestly and reasonably mistaken and therefore not guilty. *See Boyd v. State* (1991), Ind., 564 N.E.2d 519, 522 (holding that the evidence of mistake of fact produced at trial did not provide the requisite predicate for any in-

struction on the issue of mistake of fact because it did not support a finding that the mistake was reasonable).

**28.** Thus, Tyson's argument that it was error to refuse to instruct the jury that "you must accept my instructions as to the law that governs this case, and then apply that law to the facts as you find them" is untenable; such an instruction was never tendered to the trial court. *See Beasley v. State* (1983), Ind., 445 N.E.2d 1372, 1374–75 (A trial court has no duty to revise a tendered instruction so that it may properly be given.).

**29.** Tyson's appellate counsel demonstrates his awareness of the requirements of Ind.Appellate Rule 8.3(A)(7) in his brief. *See* Appellant's Brief at 17 n. 16 ("The text of the tendered and given instructions [relevant to Issue II] are set out verbatim in the Argument. *See infra,* Issue II, as required by Ind.Appellate Rule 8.3(A)(7).").

correctly states the law, whether the record supports the giving of the instruction, and whether the substance of the excluded instruction is covered by the instructions which were given. *Taylor,* 587 N.E.2d at 1303. The instruction at issue here is not a correct statement of Indiana law, as its first sentence directly conflicts with Indiana Constitution art. 1, § 19, which provides: "In all criminal cases whatever, the jury shall have the right to determine the law and the facts." A trial court may properly reject an instruction which, in whole or in part, incorrectly states the law. *Jones v. State* (1983), Ind., 445 N.E.2d 92, 93.

Further, the instructions which were given by the trial court properly explain the role of the jury. In its preliminary instructions, the court instructed the jury:

> You are also the finders of the law that applies to this case, being guided by the instructions given by the judge. You should, however, find both the law and the facts as they are and not as you would like them to be. The instructions of the Court are your best source in determining what the law is.

Record at 5518. The court's final instructions ended with the charge:

> Thus, you are oathbound to find the facts honestly and accept the law faithfully as both exist, and you should return that verdict which you find just and proper under the law as given to you in these instructions and the evidence duly presented during trial.

*Id.* at 5536. These instructions correctly and unambiguously define the role of the jury under the Indiana constitution. They properly instruct the jury that the court's instructions are the source for the jury's determination and application of the law, and they do not permit the jury " 'to make,

repeal, disregard, or ignore the law as it exists.' " *Armstead v. State* (1989), Ind., 538 N.E.2d 943, 946 (quoting *Johnson v. State* (1988), Ind., 518 N.E.2d 1073, 1076).[30] The trial court properly rejected Tyson's tendered instruction, which incorrectly states the law, in favor of instructions which clearly and accurately describe the role of the jury under Indiana law.

## VIII.

■ Tyson argues that he was denied due process because the prosecutor was able to select the trial judge who would preside over his case. The current system of assigning criminal cases to particular divisions in Marion County erroneously permits the prosecutor to determine the particular room within the criminal division to which a case is assigned. However, because Tyson has failed to show that he was prejudiced in any way by the selection of the particular room, he was not deprived of his due process rights.

On July 29, 1991, the Marion County prosecutor filed a petition requesting that a special grand jury be convened to investigate D.W.'s allegations against Tyson. Pursuant to IC 35–24–2–14 (1988), the prosecutor could file this petition with any judge in Marion County; he chose to file it with Judge Gifford, who was presiding in Room 4 of the criminal division. On September 9, 1991, the special grand jury returned a true bill indicting Tyson. By local rule an indictment is filed in the room which impaneled the grand jury. Record at 5673. Therefore, the true bill indicting Tyson was filed in Room 4, with Judge Gifford presiding. In this way, the prosecutor selected the particular room and, in the absence of a valid motion for change of judge, selected Judge Gifford as the presiding judge.[31]

---

30. Tyson cites *Johnson* for the proposition that "the jury should be instructed unequivocally that its power to determine the law does not carry with it any 'right to make, repeal, disregard or ignore the law as it exists.' " Appellant's Brief at 59. *Johnson* holds that an instruction containing this language correctly states the law. The language used by the court here, that the jury must "find both the law and the facts as

they are and not as you would like them to be" is an equally correct expression of the law.

31. The trial court found that "I don't believe that there's been any evidence submitted to show that there was any reason that it was used to come to this court in deference to any other court. Therefore the presumption would be that it was done on a random basis." Record at 5691. Tyson "does not concede that the prose-

▆▆▆▆ "Before an appellant is entitled to a reversal, he must affirmatively show that there was error prejudicial to his substantial rights." *Sharp v. State* (1989), Ind., 534 N.E.2d 708, 714 (citation omitted), *cert. denied*, 494 U.S. 1031, 110 S.Ct. 1481, 108 L.Ed.2d 617 (1990). Thus, error alone is not enough to establish a violation of Tyson's right to due process; Tyson must also show that he was, in fact, denied a "fair trial before an impartial judge." *See Harrington v. State* (1992), Ind., 584 N.E.2d 558, 561. The law presumes that a judge is unbiased and unprejudiced, *Smith v. State* (1989), Ind., 535 N.E.2d 1155, 1157, and Tyson has failed to present any evidence to overcome that presumption or to show that he was prejudiced in any other manner.[32] In fact, Tyson expressly stated before trial that he had no reason to doubt Judge Gifford's impartiality, *see* Record at 360–61 (Tyson's Memorandum in Support of Motion for Random Selection of Judge); *id.* at 5683 (hearing on Motion for Random Selection of Judge), and he apparently did not believe she was biased after trial, either, as he did not seek a change of judge when he filed his petition for post-conviction relief. *See* Ind.Post–Conviction Rule 1(4)(b) (allowing for change of judge when judge has personal bias or prejudice against petitioner). Tyson has failed to show that the fairness of his trial was in any way affected by the method by which Judge Gifford was selected to preside;

therefore, he has failed to demonstrate he was denied due process of law.

▆▆▆▆ However, we strongly urge the criminal division of the Marion County Superior Court to change the method by which cases are assigned to the rooms in the division. The existing system of filing cases is totally inappropriate and must be abandoned in favor of a system in which the prosecutor cannot control the assignment of a case to a particular judge.[33] Presently, the criminal division of the Marion County Superior Court lacks the appearance of impartiality that is required to maintain the confidence of the public and the accused in the system.

Judgment affirmed.

ROBERTSON, J., concurs.

SULLIVAN, J., dissents, with separate opinion.

SULLIVAN, Judge, dissenting.

The State opened its oral argument before this Court correctly stating as follows:

"Before I address what this appeal is all about, I wish to take a moment to address what this appeal is not all about. This appeal is not about reweighing the evidence as the defense would have you do. This appeal is not about reweighing or re-evaluating the credibility of the witnesses as defense would have you do. This appeal is not about second-guessing

cutor's motive in this case was anything but strategic,".but argues that due process is violated by the judge selection process itself, regardless of the prosecutor's motives or strategic considerations. Appellant's Brief at 64–65 & n. 74.

32. In his reply brief, Tyson states:

The State seems to suggest that the defendant must show that the trial court's rulings unfairly favored the prosecution. Proof on this point can be found in the court's recently-appealed ruling denying defendant's Verified Petition for Post–Conviction Relief.... Without even permitting defendant an opportunity to respond to the State's Motion for Summary Disposition of the Petition for Post–Conviction Relief, the trial court adopted the State's untrue and contested factual allegations as its own and then, without any basis, falsely accused the defense of trying "to perpetrate a fraud upon the court."

Appellant's Reply Brief at 35 n. 52. This is the only place, throughout both his trial and his appeal, in which Tyson alleges that Judge Gifford was in any way biased against him. An adverse ruling alone is not sufficient to prove bias. *Beverly v. State* (1989), Ind., 543 N.E.2d 1111, 1115.

33. We note that even if the prosecutor had not requested a special grand jury, the system in place currently allows prosecutors to choose which judge will hear a case. Cases are assigned sequentially to the six Marion County criminal division judges in blocks of fifty cases, and it is possible for a prosecutor to find out when cases are being assigned to a certain judge and file his or her information at that time. *See* Record at 5674–75. This system is no less objectionable than the system by which Tyson's case was assigned.

the judgment of Judge Gifford or replacing her judgment with your judgment as the defense would have you do. Rather what this is, is simply a proceeding to determine whether or not Judge Gifford committed such errors of judgment as to warrant the reversing of the conviction of Rape and Deviate Sexual Conduct returned by a Marion County Superior Court jury against Michael Tyson and granting to him a new trial." (Argument by Mr. Reuben, Deputy Attorney General, as transcribed from audio cassette tape.)

It is therefore important to acknowledge and, in making our decision, to emphasize to all concerned parties that this appeal is not about whether Michael Tyson raped D.W. and/or perpetrated two sexual deviate acts upon her. As noted by the State, our decision in this appeal does not, and should not, depend upon whether the evidence was sufficient to permit the jury to reasonably conclude that Michael. Tyson committed the three criminal acts charged. Rather, the issues involve whether the prosecution and the defense were afforded a level playing field upon which to put forth their respective cases. This appeal is quite simply about whether Michael Tyson received a fair trial. He was entitled to nothing more. But most assuredly he was entitled to nothing less. My review of the entire record in the cause leads me to the inescapable conclusion that he did not receive the requisite fairness which is essential to our system of criminal justice.[34] For this reason I dissent. I would reverse all

three convictions and would remand for a new trial.

More particularly, I dissent with respect to two major issues: Issue I, dealing with the exclusion of testimony from Ms. Martin, Ms. Lawrence and Ms. Neal; and Issue VI, dealing with refusal of instructions concerning Tyson's belief with respect to whether D.W. consented to the sexual acts involved.[35]

In dealing with the exclusion of testimony, the trial court exercises considerable discretion. In reviewing the exercise of a trial court's discretion when the trial court has articulated specific reasons for the particular ruling, "we may not attribute to the trial court some other legitimate but unexpressed reason". *Palacios v. Kline* (1991) 3d Dist.Ind.App., 566 N.E.2d 573, 575. We must focus upon the discretion *as it was exercised.* We may not, after the fact, create appellate justification for the ruling. Discretionary trial court rulings must be reversed not only when the exercise of discretion is without reason, but also when it is based upon impermissible reasons or considerations. The question is whether the trial court, for the reasons given, properly denied defendant's request to call the three witnesses to testify. *City of Elkhart v. Middleton* (1976) 265 Ind. 514, 356 N.E.2d 207.

I discern no persuasive rationale which permits a reviewing court to give a criminal trial court much more latitude in making evidentiary rulings than is given to civil trial courts. I agree with the majority's position that deference should be afforded

---

**34.** In this regard I wish to make it clear that I fully concur in the majority opinion with respect to Issue VIII. That issue involves the process by which the judge was selected. We necessarily condemn that process. However, there is absolutely no evidence or permissible inference that Judge Gifford acted in any manner other than with total lack of bias or prejudice. That I believe several of the judge's rulings were erroneous, requiring reversal, in no way dispels my belief that Judge Gifford acted with complete and unswerving judicial integrity and impartiality.

**35.** Because upon a retrial at least one of the other issues involved could recur, I consider it

not inappropriate to state my disagreement with a pronouncement by the majority.

With respect to Issue V which concerns the reading of a portion of Justice White's dissent in *United States v. Wade* (1967) 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, I agree that the defendant waived the matter because his objection was inadequate. I do not agree, however, that a jury admonition could cure the prejudicial impact of the language read. Reading of the passage in the future by prosecutors, whether during voir dire or opening or closing argument should be condemned in the strongest possible terms. *See Bardonner v. State* (1992) 4th Dist.Ind.App., 587 N.E.2d 1353, *trans. denied.*

rulings of trial courts. That deference, however, has limits and boundaries. The majority begs the question in perceiving a difference between rulings made after the trial court properly applied applicable legal standards and rulings made after application of incorrect legal standards. It goes without saying that determinative deference is given to a ruling in the former category. Quite simply, a ruling made by correct application of applicable legal standards is a correct ruling and will be affirmed. It is not a matter of giving deference at all.

The trial court's ruling was based first upon the conclusion that, although not acting in bad faith, the defense nevertheless had substantially breached the discovery order by a delay in notification to the State as to the existence of the witnesses. The second reason given was that to permit the three witnesses to testify would result in prejudice to the State in that several State witnesses, including D.W., had concluded their testimony. The latter rationale was premised, in large measure, upon the State's contention that it would interrupt the flow of the State's presentation and would undoubtedly require recalling some witnesses and obtaining new witnesses, all of whom would testify in an allegedly less effective manner upon rebuttal.[36]

### BREACH OF DISCOVERY AND DELAY

Although there was a time lapse between the receipt of information by Mr. Webb that certain witnesses with relevant information might exist and notification to the State, such "delay" did not and could not have violated the discovery order of the court. The discovery order of December 11, 1991 directed exchange, by December 18, 1991, of lists of all witnesses expected to be called. Clearly, and as noted by the majority, prospective witnesses whose existence was not discovered until January 30, 1992 could not have been listed and dis-

closed to the State prior to December 18, 1991. The perceived "discovery breach" could then only refer to the "delay" between Thursday evening, January 30, when Mr. Webb received a phone call concerning possible witnesses, and Sunday when the names of the three individuals and the general substance of their anticipated testimony were given to the State.

Defense counsel had a duty to make reasonable investigation before seeking to add witnesses. Furthermore, for defense counsel to prematurely and without investigation advise the prosecution of witnesses who might well provide evidence against the defendant would be a breach of the ethical duty to one's client. Defense counsel is not required to, and may not ethically, assist the prosecution in its collection of evidence, case preparation, and trial presentation. Not only was there no discovery order breach, there was no delay, substantial or otherwise.

Even if there were some degree of unexplained delay, given the absence of bad faith upon the part of the defense, the State at most would be entitled to a continuance. *Boyd v. State* (1985) Ind., 485 N.E.2d 126. Failure to request a continuance constitutes a waiver of an alleged discovery breach. *Jester v. State* (1990) Ind., 551 N.E.2d 840, 842.

The majority correctly observes that there was no necessity to seek a continuance when the trial court had already made its ruling excluding the testimony. The fact that the evidence was excluded, in part because of a discovery breach upon the part of the defendant, does, however, bring the protection of a continuance into play. The State's clear desire to avoid a continuance destroys the State's argument that exclusion was justified by a discovery breach upon the part of defendant. Such a breach, absent bad faith, calls for a continuance—not exclusion of the evidence. As

---

**36.** The trial court added that it did "not appreciate being put in this position in the middle of a trial that's taken a great deal of effort, if there is any possibility that it was done with the idea of causing some kind of a reversible error." Record at 4206. Clearly, however, the trial court would not have refused an otherwise valid request to present newly discovered evidence merely because it might affect, in some adverse manner, the substantial effort already put forth by the court.

held in *Patel v. State* (1989) Ind., 533 N.E.2d 580, 585: "[E]xclusion of the evidence is appropriate only when the [defense] has blatantly and deliberately refused to comply with the discovery order." Notwithstanding *McCullough v. Archbold Ladder Co.* (1993) Ind., 605 N.E.2d 175, cited by the majority, *Patel* has not been overruled.

Not only did the State not seek a continuance, it categorically stated that it did not want a continuance. The State did not want the "flow" of its case interrupted. It offered the view that certain of the witnesses who had concluded their testimony would have to be recalled and other new witnesses called as rebuttal witnesses and opined that rebuttal evidence is generically less effective and given less weight than testimony during the case in chief. I believe such speculative conclusion is wholly erroneous, particularly because the State could clearly explain to the jury the reason why the rebuttal was necessary. Furthermore, the fear of the prosecution was wholly unjustified in light of the remote and unlikely possibility that the jury, for reasons solely related to the order of presentation, would erroneously diminish the weight to be given the testimony. The jury was clearly instructed that they should seek to indulge the theory

> "that every witness is telling the truth ... that [they] should not disregard the testimony of any witness without a reason and without careful consideration ... [that] the number of witnesses who testify to a particular fact, or the quantity of evidence on a particular point need not control [their] determination of the truth ... [and that they] should give the greatest weight to that evidence which convinces [them] most strongly of its truthfulness." Record at 1117.

In any event, the arguable inconvenience to the prosecution does not justify preventing the defense from presenting relevant evidence which might have tipped the balance in light of the reasonable doubt standard governing the jury.

The State's position with respect to the prejudice to its presentation of evidence becomes somewhat schizophrenic, and most certainly inconsistent. On the one hand, the State attempts to diminish the importance of the testimony of the three witnesses by asserting that it would have had minimal impact upon the issues and was meaningless as merely cumulative. On the other hand, the State has acknowledged that the excluded testimony might have grave implications for a successful prosecution. It so indicated by emphasizing the great lengths to which the State would have to go to combat this testimony. It is clear that the State did not think the evidence to be merely cumulative. The State was very concerned "given the impact of these witnesses on this case, given the notoriety of this case, given what this case is all about.... These witnesses clearly would have been telling a story wholly different than the story we had." (Argument by Mr. Reuben, Deputy Attorney General as transcribed from audio cassette tape.)

As earlier noted, we are restricted in validating the ruling of the trial court to the reasons she gave. The trial court did not base its exclusion of the testimony upon a determination that the proffered evidence would merely be cumulative. The majority here, however, utilizes a conclusion to that effect to affirm the ruling. In doing so it errs. It is appropriate to consider that issue, however, in terms of harmless error and I will do so. The question is whether the exclusion was harmless beyond a reasonable doubt.

The question as to whether evidence is merely cumulative is normally found in cases in which a new trial is sought for newly discovered evidence. Certainly, if, following judgment, evidence is newly discovered which is not merely cumulative and is of such character as to call for a new trial, evidence of the same character should even more readily be admitted if discovered during trial. When the newly discovered evidence is advanced in sufficient time to permit the opposing party an opportunity to prepare adequate cross-examination or produce contrary witnesses, it should not be excluded. The trial court's erroneous

ruling here has given rise to the necessity for a new trial. That drastic but necessary step could have been averted by permitting the three witnesses to be called and to testify.

It is my view that the majority erroneously or inadvertently uses the term "cumulative" interchangeably with the term "corroborative". Cumulative evidence is that which goes to prove what has already been established by other evidence. *Davis v. State* (1983) Ind., 456 N.E.2d 405; *Newell v. Walker* (1985) 2d Dist.Ind.App., 478 N.E.2d 1246. It is evidence "of the same kind, to the same point." *Union Central Life Insurance Co. v. Loughmiller* (1903) 33 Ind.App. 309, 314, 69 N.E. 264, 266. Corroborative evidence tends to corroborate or to confirm while cumulative evidence merely augments or tends to prove what has already been proved. *State v. Kennedy* (App.1979) 122 Ariz. 22, 592 P.2d 1288. The distinction has been synthesized as follows:

> "Cumulative evidence is additional evidence to support the same point, and which is of the same character with evidence already produced.... Though on the same point it may yet not be cumulative, but, if of the same kind, it is cumulative.... If it is of a different kind, though upon the same issue, or of the same kind upon a different issue, it is not cumulative.... Evidence which brings to life some new and independent truth of a different character, although it tends to prove the same proposition or ground of claim before insisted on, is not cumulative, within the true meaning of the rule.... The fact that newly discovered evidence may tend to prove the same issues upon which proof was offered at trial does not necessarily make it cumulative, and whether or not it is cumulative is to be determined from its kind and character, rather than from its effect." 10A *Words and Phrases, Cumulative Evidence* 406–07 (1968) (citations omitted).

The testimony sought to be admitted here was different in kind and character from other evidence adduced at trial. It went to an issue or issues and to facts or observations not covered by other evidence. It was not cumulative. It may have been in the nature of corroboration with respect to the crucial facts surrounding and immediately preceding the sexual acts but that very aspect of corroboration is what made the exclusion of the evidence prejudicial to the defense.

One federal commentator, citing *Gordon v. United States* (1953) 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447, has stated that reversal will lie "[w]hen the record appears to show that the excluded evidence would have been more persuasive than, or would have afforded needed corroboration to, evidence already in the record." 3 *Orfield's Criminal Procedure Under the Federal Rules* § 26.342 (1986).

In *Shepard v. State* (1983) 1st Dist.Ind. App., 451 N.E.2d 1118, *trans. denied,* Judge Robertson, speaking for the court and joined by Judges Shields and Buchanan, reversed a conviction for excluding evidence of threats made to the defendant who was claiming self-defense. The court, apropos of the case before us, reversed because: "When a defendant claims that he acted in self-defense, evidence legitimately tending to support his theory is admissible ... [and because] these threats are relevant to Shepard's defense and his claim of having a good faith belief of great bodily harm." 451 N.E.2d at 1120.

*United States v. Peak* (1988) 7th Cir., 856 F.2d 825, *cert. denied,* 488 U.S. 969, 109 S.Ct. 499, 102 L.Ed.2d 535, is to the same effect and is also persuasive. There, the court reversed a conviction for exclusion of evidence which would have reflected the defendant's state of mind and which bore upon his intent, or lack thereof, to possess and distribute drugs. The court also, interestingly, instructed the trial court upon remand that it "should reevaluate its refusal to give the jury an instruction on [defendant's] theory of defense". 856 F.2d at 836.

The only other witnesses to the events upon which the proffered testimony focused were D.W. and Tyson. Those two witnesses could certainly not be classified

as disinterested witnesses. The testimony of an objective witness is not of the same character as evidence from a prosecuting witness or the defendant himself, or from others with a direct personal stake in the outcome. In *Newell v. Walker, supra,* we ordered a new trial for newly discovered evidence which was comprised of testimony of "the only disinterested person to witness events crucial to the case...." 478 N.E.2d at 1251. *See also Harris v. Jay* (1930) 92 Ind.App. 543, 174 N.E. 107; *State v. Evans* (1920) Or., 192 P. 1062, 1065. *Shumaker v. State* (1988) Ind., 523 N.E.2d 1381, relied upon by the majority, is inapposite. In *Shumaker,* the defendant himself characterized the excluded evidence as having only a "slight tendency" to establish defendant's non-violent nature. Furthermore, the excluded witness was not wholly disinterested, having been a bowling partner of the defendant and the victim for some five years, and her testimony would have merely duplicated other testimony as to defendant's character.

One aspect of the majority opinion considers the excluded evidence as merely impeaching in nature and holds that it was merely cumulative of evidence which impeached D.W. "on other points". Opinion at 286–287. I strongly disagree. Even if the offered evidence were to be construed solely as impeaching, impeachment upon one issue is not cumulative of impeachment upon other issues. To so hold is to say that impeachment with regard to an essential issue of the litigation is merely cumulative to evidence which impeaches as to a minor collateral matter.

The evidence of record, to which the excluded evidence is thought by the majority to be cumulative, demonstrates that the jury was entitled to believe that there was consensual sexual contact in the hotel room. There was testimony to that effect from Reverend Katherine Newlin, who attended D.W. at the hospital. Record at 4398 (as quoted by majority in footnote 11). At a very minimum, such testimony gives rise to a strong and reasonable inference of consensual sexual contact in the hotel room. It is baffling indeed, therefore, that the majority proceeds to cavalierly discount the defendant's reasonable belief contention.

The manner in which Tyson and D.W. acted toward each other shortly before the acts complained of has great relevance to whether or not Tyson, at the time, might have reasonably believed, *from all the surrounding circumstances and events,* that D.W. was consenting—even though as a factual matter she did not consent. The majority concedes that a reasonable jury might reasonably believe that Tyson had a reasonable belief that D.W. would consent. Under the circumstances, this conclusion permits a corollary conclusion that the belief continued during the sexual acts. The issue is not whether Tyson reasonably believed that D.W. would consent. It is whether he reasonably believed that she was consenting. In this sense, then, the exclusion of the testimony from Martin, Neal and Lawrence was particularly prejudicial and that prejudice was magnified by the failure to give instructions with respect to mistake of fact, reasonable belief or to instruct that the degree of culpability, i.e., knowing, was applicable to the essential element of compelling force.

In holding that the evidence excluded was "only minimally corroborative of Tyson's testimony" with respect to D.W.'s receptiveness to Tyson's physical advances, the majority usurps the jury function. It is totally inappropriate for this court to convert speculation as to the credit and weight which a jury would give certain evidence or the impact of such evidence upon their consideration of other evidence into a holding as a matter of law.

Without question there was error in excluding the testimony of Ms. Martin, Ms. Neal and Ms. Lawrence. Without question that error was not harmless beyond a reasonable doubt.

### MISTAKE OF FACT AND REASONABLE BELIEF INSTRUCTIONS

Instructions Nos. 5 and 6 tendered by the defense were erroneously and prejudicially refused by the trial court. Instruction No.

5 concerned application of the culpability requirement of "knowingly" to the act of coercive force and whether Tyson could have reasonably believed that D.W. had consented. Instruction No. 6 dealt with mistake of fact as to whether D.W. had consented.

Consent or the lack thereof is a fact. D.W. either consented or she did not. If she consented, that is a fact. If she did not consent, that is a fact. Resolution of that fact question, however, does not end the inquiry. The law provides that if a person accused of rape is reasonably mistaken as to the fact of consent when the alleged victim, in fact, did not consent, such mistake negates the culpability required for the crime. The "reasonable belief" principle, though similar, is not synonymous with mistake of fact. The difference was explained in *People v. Rhoades* (1987) 193 Cal.App.3d 1362, 238 Cal.Rptr. 909, 913:

" 'Where the defendant claims that the victim consented, the jury must weigh the evidence and decide which of the two witnesses is telling the truth.' The defense of a reasonable belief in consent by contrast, 'permits the jury to conclude that both the victim and the accused are telling the truth. [Citation omitted.] The jury will first consider the victim's state of mind and decide whether she consented to the alleged acts. If she did not consent, the jury will view the events from the defendant's perspective to determine whether the manner in which the victim expressed her lack of consent was so equivocal as to cause the accused to assume that she consented where in fact she did not.' " [Quoting *People v. Romero* (1985) 171 Cal.App.3d 1149, 1155–56, 215 Cal.Rptr. 634.]

However, in the context of the case before us, the concepts are so closely related as to be equated. *See People v. Burnham* (1986) 176 Cal.App.3d 1134, 222 Cal.Rptr. 630 (mistake of fact instruction equated with an instruction which directs the jury to acquit if the jury entertains reasonable doubt as to whether defendant reasonably and in good faith believed that the victim freely consented).

Whether a defendant's mistake or belief is reasonable depends upon the attendant circumstances. In the case before us, those relevant and crucial circumstances are not restricted to the occurrences in the hotel room beginning with the point at which Tyson "undress[ed]" D.W. Slip Opinion at 36. They include other circumstances of the day and night preceding the encounter and the activities of the early morning hours which led to the occurrences which transpired in Tyson's hotel room. In this regard, as earlier noted, the excluded testimony of Ms. Martin, Ms. Neal and Ms. Lawrence would have added to the factual mix before the jury and may have reasonably tipped the deliberative balance in favor of acquittal.

The evidence quoted and analyzed by the majority (*see* Opinion at 294, *et seq.*), when taken together with the surrounding circumstances, permit a reasonable belief as to the fact of consent. Stated conversely, if the jury believed that Tyson used only such "force" as would be involved in a consensual sexual act, they may well have concluded that Tyson reasonably believed that D.W. was consenting. Regardless of whether D.W.'s subjective mental state reflected actual consent, and even if as a fact she did not consent, Tyson may have reasonably believed that she was consenting. That question is peculiarly within the prerogative of the jury. They were not permitted to exercise this prerogative, not only because they were precluded from hearing three relevant witnesses, but because they were not advised of the appropriate legal principles which would constitute the essential framework within which to assess the evidence and to consider the relevant attendant circumstances. In short, by refusing to give defendant's tendered instructions, the trial court denied the jury the proper tools necessary for performance of their duty. They were effectively forced, in this regard, to make factual determinations in a vacuum.

It is improper to deny a reasonable belief instruction, as does the majority here, based upon an evaluation of the weight of the evidence or the credibility of the wit-

nesses. Refusal to give the instruction upon grounds that no reasonable person would have interpreted the evidence to indicate the victim's consent impermissibly invades the jury's province. As stated in *People v. Burnham, supra,* 222 Cal.Rptr. at 637:

> "The ... contention that we should declare, as a matter of law, the appellant's assertions [as to reasonable belief] are unreasonable is, in reality, a request that we declare the appellant's assertions to be incredible as a matter of law. The fact that the evidence may be incredible, or is not of a character to inspire belief, does not authorize the refusal of an instruction based thereon, for that is a question within the exclusive province of the jury."

Thus it is not true that when a defendant gives an account evincing the alleged victim's consent, and the victim gives a contrary version, that there is no evidence to support a reasonable belief instruction. Such a view is to say that the fact of consent or non-consent is the be-all, end-all of the issue. It is to hold that mistake of fact or reasonable belief does not exist in Indiana law.

In *Woods v. State* (1992) 1st Dist.Ind. App., 587 N.E.2d 718, *trans. denied,* the court, speaking through Judge Robertson, upheld the giving of a mistake of fact-reasonable belief instruction which had been requested by the State. The instruction advised the jury:

> "For the 'mistake of fact' to be a valid defense, the following three elements must be satisfied:
> 1. The mistake must be honest and reasonable;
> 2. The mistake must be about a matter of fact; and
> 3. The mistake serves to negate culpability.

> Honesty is a subjective test dealing with what the defendant actually believed. Reasonableness is an objective test inquiring what a reasonable man situated in similar circumstances would do."

587 N.E.2d at 723.

The instruction was approved because it "clarified the defense" of mistake of fact. *Id.* In the context of the facts of *Woods,* the mistake of fact defense could only have been offered with regard to the defendant's belief as to the victim's consent.

While the word "consent" does not appear in I.C. 35–42–4–1, the word "compelled" is used. It is clear, therefore, that the force or threat of force must have compelling effect upon the alleged victim. The fact of coercion is therefore an indispensable element of the crime. The majority here attempts to divorce the word "force" from the word "compelled" in order to avoid the application of the required degree of culpability. This attempt, in my view, borders upon sophistry. The act upon which the definitions of the crimes focus is sexual intercourse, or deviate conduct by compelling force.

The majority considers the matter of proof of culpability, upon which the prosecution bears the burden, as if it were a part of the "defense" of "mistake of fact" or "reasonable belief". As noted, the coercive aspect of the force used requires proof of culpability. The majority erroneously turns the matter away from proof of culpability, a prosecutorial requirement, and toward establishment of a defense by the defendant.

The majority seeks to draw a significant distinction between our culpability statute and that of the Model Penal Code. Model Code § 2.02(4) does not use the word "conduct" in referring to material elements of the offense. This is not, however, particularly meaningful. Again, the prohibited conduct is force which coerces. The fact of coercion is without question a "material element" of the act of "force". Without coercion, there has been no crime of rape or deviate conduct committed. Our statute and our law is wholly consistent with the Model Penal Code.

The fact of coercion is not merely an "attendant circumstance" as was the case in *Rose v. State* (1982) 2d Dist.Ind.App., 431 N.E.2d 521. It is an essential element of the act itself. In *Rose,* defendant shot and killed the victim and was convicted of

battery. The "attendant circumstance" involved the victim's conduct, i.e., whether the victim was committing a forcible felony justifying intervention by the defendant. That circumstance is not part of the definition of battery as set forth in the statute. It was therefore not an element of the offense and application of the degree of culpability to it would have been inappropriate.

Similarly, *Markley v. State* (1981) 2d Dist.Ind.App., 421 N.E.2d 20, involved battery as a Class C felony which requires serious bodily injury as an element. In that setting, the element is a clear result of the prohibited conduct. In essence, the statute prohibits the act of touching in a rude, insolent or angry manner and, as the holding in *Markley* points out, the result, although an element of the crime, merely "increases the penalty for the offense committed without proof of any culpability separate from the culpability required for the conduct elements of the offense." 421 N.E.2d at 21.

The rape and deviate conduct statutes clearly differ from the battery statute in this respect. Again, in the former statutes, the "result" element is an integral part of the prohibited conduct element. It is not mere force which is prohibited. It is coercive force.

The concept of victim impact as an element of the prohibited conduct is very much a part of Indiana criminal law. A person commits theft under I.C. 35–43–4–1(4) if he exercises unauthorized control over the property of another by creating a false impression in the other person or under subsection (5) by failing to correct a false impression that the defendant knows is influencing the other person. Thus under subsection (4) we look to the victim's state of mind as to whether the false impression did in fact exist and whether the impression was otherwise than what the true facts disclosed. Under subsection (5) the culpability of the defendant is tied directly to the effect of the defendant's conduct and its subjective impact and influence upon the victim.

More closely related to the case before us is the crime of child molesting. I.C. 35–42–4–3(e) makes it a defense if the defendant reasonably believed that the child was over the age of sixteen. Thus, although as a fact the child is under the age of sixteen, if the defendant reasonably believes otherwise he has not committed the crime. *Neblett v. State* (1979) 2d Dist.Ind.App., 396 N.E.2d 930. A similar situation exists with respect to the crime of rape as it relates to a mentally disabled victim. I.C. 35–42–4–1.

In *Garcia v. State* (1983) Tex.Cr.App., 661 S.W.2d 96, 97, the court spoke to the matter as follows: "The female's condition, coupled with the male's *knowledge* of the mental defect or disease, substitutes for lack of consent by the female...." (Emphasis in original.) The court in examining the record stated that the victim "had all the outward appearances of a normal appearing twenty-six year old female" and that defendant had no reason to know of her mild retardation. Clearly then, the defendant's perception of the situation in many areas of the criminal law is important, particularly with regard to sex crimes such as here involved.

It is argued, and the majority opinion adopts the argument, that the jury's determination that D.W. did not consent carries with it a corollary—that the same evidence could not support an instruction that a person could reasonably believe that she did consent. This in turn leads to the majority's conclusion that Instructions 5 and 6 were not supported by the evidence and their refusal was not error at all, or that error, if any, was harmless. The reasoning is faulted.

It cannot be emphasized too strongly that the question is not sufficiency of the evidence to convict of rape and deviate conduct. The question in regard to the instructions is, rather, whether Michael Tyson was entitled to have the jury assess that evidence in the light of applicable law.

The assessment of the evidence and the import given to certain portions of the evidence might differ depending upon the instructions given. This is the very purpose of jury instructions. The question then

becomes: Would the verdict arguably have been different if the instructions had been given? The answer is: We simply do not know. We cannot say that the failure to give the instructions, particularly in the light of the exclusion of relevant evidence, was harmless beyond a reasonable doubt.

The instructions, if given, might have resulted in the same verdict. But they might not have. The jury, in light of the instructions might have reasonably concluded that while D.W. did not consent, Tyson did have an honest and reasonable belief that she did so. The jury was entitled to make that determination, not the trial court and certainly not this court.

The erroneous rulings herein considered dictate reversal and remand for a new trial.