**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KIMMERLY A. KLEE**
Greenwood, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| VICTOR SMITH, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | ) No. 49A02-1109-CR-860 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol J. Orbison, Judge
Cause No. 49G22-0905-MR-52143

**October 9, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**BROWN, Judge**

Victor Smith appeals his convictions for robbery and attempted robbery as class B felonies. Smith raises four issues which we consolidate and restate as:

I.  Whether the trial court abused its discretion and violated Smith's confrontation rights by admitting the discovery deposition of Justin Callaway and excluding a video reenactment of the offense;[1]

II.  Whether the trial court abused its discretion by denying Smith's motion for a separate trial from that of his codefendant; and

III.  Whether the trial court abused its discretion by denying Smith's motions for mistrial.[2]

We affirm.

The relevant facts follow. Jeremy Swift and Justin Callaway knew each other in middle school. Callaway moved away from Indianapolis and returned in late August or early September prior to the beginning of his senior year in high school. In late December or early January 2009, Swift was driving his cousin Ramone Swift and Callaway when Robert Johnson called Swift. Swift indicated that Johnson wanted a blunt and drove to the back of the Lakeview Apartments. Johnson walked up to Swift's car, entered the backseat of the car behind Swift, purchased a blunt from Callaway, and then said: "I'm a be hitting you up. I'm, I be around here needing weed." State's Exhibit 25A at 374.

---

[1] The transcript spells Justin's surname as "Calloway," but his deposition in which he spelled his name indicates that his surname is Callaway.

[2] Smith lists the issue of "[w]hether the trial court erred in its admission of 404(B) evidence," Appellant's Brief at 1, but appears to discuss this issue only in the context of whether the court abused its discretion by refusing to grant him a trial separate from that of his codefendant and whether the trial court abused its discretion by denying his motion for mistrial.

On January 25, 2009, Swift received a phone call, drove Callaway to a location near the Lakeview Apartments, and parked his car near where Johnson and another man were standing on a sidewalk and wearing black hoodies. Johnson and the man indicated that they wanted five dollars worth of marijuana instead of ten dollars and entered the car. After Swift gave Johnson some marijuana, Johnson and the man exited the car, and Callaway felt something pulling on his hoodie and saw a gun in his face. Swift put the car in reverse and "whipped out" and hit another car. Id. at 393. Swift's car then went dead, and Swift jumped out of the car and starting running. Two or three men wearing masks and hoodies then "ran in," searched the back seat of Swift's car, hit Callaway, asked him "where everything was," and took his cell phone. Id. at 398. Callaway then heard a shot, and the men left. Callaway glanced over, saw Swift on the ground, jumped out of the car, and ran over to him. Callaway called 911 on Swift's cell phone. Swift died the following day from a gunshot wound to the head.

Indianapolis Metropolitan Police Sergeant Mark Hess located Callaway's phone later during the evening of January 25, 2009, on the ramp from westbound 70 on to northbound Emerson Drive. On January 30, 2009, Indianapolis Metropolitan Police Detective Steven Scott came into contact with Smith when he found him "up under a car." Transcript at 481. Detective Scott retrieved a pair of black gloves, a black face mask, a black hat, two "hoodie-style upper top wear," and Smith's Indiana State identification card from Smith. Id. at 474. Detective Scott placed the items in a bag and placed the bag on the desk of Detective Lesia Moore.

3

Rochella O'Neil, a latent print examiner with the Indianapolis Metropolitan Police Department, identified a print retrieved from the exterior driver's side rear opera window of Swift's car as belonging to Smith. O'Neil also identified a fingerprint from Callaway's recovered cell phone as belonging to Smith.

On May 29, 2009, a grand jury indicted Smith for murder, felony murder, robbery as a class B felony, and attempted robbery as a class B felony. On April 8, 2010, Smith filed a *pro se* motion for a separate trial requesting he be tried separately from Johnson.[3] On April 28, 2010, the State filed a notice of intent to introduce evidence under Ind. Evidence Rule 404(b) and mentioned Johnson's plea of guilty related to his attempted murder of Corrionna Johnson.

The court held a jury trial beginning on May 23, 2011. Johnson's counsel moved to exclude certain evidence related to the attempted murder of Corrionna Johnson under Ind. Evidence Rule 404(b), and the court took the motion under advisement. Smith's counsel asked that Smith's trial be severed if certain evidence mentioned in Johnson's Rule 404(b) motion was allowed, and the court took the motion under advisement.

Smith's counsel also asked that the ski mask found on Smith when he was arrested be excluded because the defense did not know that the ski mask existed until the previous night and argued that the mask changed the entire theory of the case. The prosecutor indicated that the police report from Smith's arrest indicated that a mask was taken from Smith and that the police report was disclosed to the defense on July 8, 2009. The court

---

[3] We observe that the motion lists "Victor Powell" as the defendant. Appellant's Appendix at 62. However, both the State and Smith indicate that it was Smith who filed this motion.

4

initially indicated that it would allow the admission of the mask, but, after further discussion, took the matter under advisement.

The court indicated that evidence of Johnson's attempted murder of Corrionna would be allowed into evidence, and Smith's attorney renewed her motion to sever Smith's trial "away from that 404(b) evidence" because it was detrimental and prejudicial. Id. at 95. Smith's attorney also argued: "I don't think it can be remedied by an instruction and there is absolutely no evidence whatsoever that my client was in any way, shape, or form, involved with the attempt[ed] murder of Corrionna Johnson." Id. The court denied Smith's motion to sever.

On May 24, 2011, the prosecutor raised the issue of Callaway's failure to appear in court and asked for a body attachment. Detective Moore testified that Callaway was personally served on May 12th with a subpoena indicating that he was supposed to be available the week of trial. Detective Moore explained the subpoena to Callaway, and Callaway signed the subpoena. Investigator Roy West with the Marion County Prosecutor's Office testified that he gave a subpoena to Callaway on May 17, 2011, for a deposition on May 18th and a subpoena for trial on the week of May 23rd. On May 18, 2011, Investigator West went to pick up Callaway, but Callaway's grandmother informed him that Callaway thought that the deposition was for that Thursday. Investigator West returned to Callaway's residence on May 19, 2011, after arrangements had been made for him to return for a deposition, and Callaway gave a deposition that day. On May 23rd, Investigator West left a voicemail message for Callaway indicating that he would pick him up the following morning. On May 24th, Investigator West went to Callaway's

residence, and Callaway's grandmother informed him that she had last seen Callaway on Sunday and that no one in his family had seen him since then. Investigator West went to Callaway's place of employment, attempted to contact Callaway's girlfriend, and contacted several family members of Callaway in an attempt to locate him but was unsuccessful. Investigator West also testified that Callaway's grandmother indicated that Callaway was fearful of coming to court because he believed something would happen to him. The prosecutor requested that the court issue a body attachment for Callaway, which the court did.

On the third day of trial, the prosecutor indicated that the State was still unable to locate Callaway. Investigator West testified that Callaway had initially indicated that he was scared to come to trial out of fear that he was going to be hurt or killed but became cooperative in subsequent dealings and that he was unable to find Callaway's location. Investigator West also indicated that the Violent Crimes Unit was still looking for Callaway. The prosecutor argued that the May 19th deposition of Callaway was admissible under Ind. Evidence Rule 804(b). Specifically, the prosecutor argued:

> As for Victor Smith, [Smith's counsel] was informed of the deposition date and time. She did decline to attend. That decision to decline to attend the deposition was her choice and Crawford only speaks of the opportunity to cross examine someone. If the defense counsel chooses not to do that, that is their decision but the opportunity was there and that satisfies the Crawford requirement for confrontation in this particular case.

Id. at 353.

> Smith's counsel stated:

> Judge, I am just making my objection to the entrance of the deposition. I was not in attendance of the deposition. Well, I was told by the State that Mr. [Callaway] was available and would be here for trial. I did, in fact,

know of the date of the deposition and did, in fact, consciously decide not to attend since we had, I think, four other statements that he had given – enough for me to know what he was going to say and impeach him with that. So I would object to the entrance of the deposition. Because I was not there, I did not confront and cross examine. It was last week and I had been told that Mr. [Callaway] would be here for trial. Having that been said, I do believe that the State has made a good faith effort to secure him to be here at trial. I will object to the entrance of that and I would offer . . . these are my two concerns: Number One, we are going to have a deputy prosecutor reading the transcript who, in my estimation, will not sound anything like Mr. [Callaway] and will not put forth the type of attitude I think Mr. [Callaway] would put forth, as well, so I have a problem with that. I also have a problem in that I don't want this jury to get the impression he is either dead, scared, or any of those things. I would like somehow, be it through [Lesia] Moore, to get in that he is just not here for testimony. I don't want that to be misconceived. I do offer this, however. There was a re-enactment done where he is on video, talking, and giving a statement of exactly what happened. Detectives are asking him questions, and I think that that testimony, that live testimony, would be just fine in lieu of the deposition. I would offer that to the Court.

Id. at 353-355.

> With respect to Smith, the trial court stated:

> Counsel for Mr. Smith was advised of the date of the deposition and has advised the Court that she determined that she did not wish to attend the deposition, having available for her perusal the multiple statements that had previously been given by Mr. [Callaway]. Under Trial Rule 32(A)(3)(d), I think that the requirements that are basis [sic] for introducing a deposition at trial in the absence of a witness have been met in this case.

Id. at 364. The court also found that the absence of Callaway was not procured by the State and that the State made every effort to obtain Callaway's attendance. The court allowed the deposition into evidence and requested that the parties meet and determine what portions of the deposition should be excised if any.

The parties then argued regarding the admissibility of the video reenactment. The prosecutor argued that the reenactment was inadmissible because it contained "a lot of

7

opinion testimony of individuals who would not be present" and would not be relevant. Id. at 366. Smith's counsel argued that it would be beneficial for the jury to "see [Callaway], hear his words, see his demeanor, etcetera, in other circumstances." Id. Smith's counsel also stated that "[t]here is not a rule for it to come under," but argued that "in the interest of justice it should be played for the jury." Id. at 367. The prosecutor argued that there was nothing that Callaway says in the reenactment that implicates Smith, that the video contained hearsay, and was prejudicial to the State. The court stated that it would be more than happy to look at the reenactment.

After reviewing the video reenactment, the court found that it was inadmissible, specifically, stating: "[T]he Court has reviewed the video of the re-enactment and the Court finds that there is too much commentary by the police, in addition to which it is definitely hearsay, and I see nor heard no basis for allowing that into evidence as an exception to the hearsay rule, so that piece of evidence will not be admitted." Id. at 458-459.

The State called Corrionna Johnson as a witness, and Smith's attorney objected. The court gave the following limiting instruction: "Ladies and gentlemen, the testimony of Corrionna Johnson is to be considered by you only as it relates to defendant Robert Johnson. It should not be considered in any manner by the jury in determining the guilt or innocence of defendant Victor Smith." Id. at 434. Corrionna testified that Johnson was her "old buddy," that he told her that she was a snitch on multiple occasions, and that Johnson said, "Bitch, you're a snitch. Snitch on this," and shot her on the left side of her face. Id. at 436, 442.

8

With respect to the ski mask, Detective Scott testified that Smith had a mask "up under a pair of sweat pants" and that the items were taken from Smith on January 30, 2009. Id. at 414. Detective Scott placed the items in a plastic bag, transported them to the downtown facility, marked Smith's name, the date, and a description of the contents on a note which he placed inside the bag, and placed the bag on Detective Moore's desk. Detective Scott also testified that he recognized the items presented in court as those that were taken off Smith when he transported him to the homicide office. Detective Moore testified that she returned to the homicide office after executing a search warrant, inventoried the property, and placed the property in the property room. Detective Moore also testified that the black ski cap was the one that she placed in the property room.

The court found that the chain of custody was sufficient and allowed the admission of the articles found on Smith. Smith's attorney moved for a mistrial and argued: "I do not believe that this is admissible. Because of this ruling now, I did not, in my voir dire, or because it was under advisement for my opening or any of my questioning, deal with this mask because I had not had a ruling yet, so at this point I do not think my client can have a fair trial and I am asking again for a mistrial." Id. at 456-457. The court denied Smith's motion for mistrial. Callaway's deposition was then read into evidence with an employee of the Marion County Prosecutor's Office reading Callaway's statements, the prosecutor reading his statements, and Johnson's attorney reading her statements.

After the State rested, Smith moved for "judgment on the evidence/directed verdict" as to all counts. Id. at 512. Smith also moved for a mistrial "based on the

admission of multiple things that have been introduced in this trial . . . ." Id.  The court

denied Smith's motion for judgment on the evidence.

After deliberations began, Juror Number 10 sent the court a note indicating that

she recognized a woman in the courtroom and that she was "overwhelmed and scared."

Id. at 616.  The court brought Juror Number 10 into the courtroom and questioned her

and made her available to be questioned by the attorneys.  Juror Number 10 indicated that

the woman she recognized was a parent in the school where she works, that she did not

know who the woman was "associated with," that she told two other jurors that she "felt

[she] was seeing someone that [she] knew that has been in [her] school," and that she was

"scared because [she had] seen [the woman] in [her] school."  Id. at 618-620.  Juror

Number 10 also indicated that she "had a breakdown and started crying" and that the

other jurors saw her.  Id. at 621.  The court excused Juror Number 10 for cause.  Smith's

counsel stated:

> My fear is this.  [Juror Number 10] has told two people she knew
> somebody and where they were sitting.  She has expressed that she is
> scared. . . .  Take her off and replace her with an alternate.  We need to get
> rid of the other two and we don't have that many alternates to replace them
> and she has, in my opinion, tainted the jury.

Id. at 622.

The court then brought the two jurors into the courtroom individually and

questioned them.  Juror Number 1 indicated that Juror Number 10 had told her that she

noticed a woman that she believes is in her school and was "just very nervous . . . about

whatever happens and then that is somebody she is going to see, regularly."  Id. at 625.

When asked by the court whether she felt that she could assure the court that she could

continue to deliberate with an open mind and make a decision based on only the evidence presented, Juror Number 1 stated, "Oh, yes, ma'am." Id. at 627. Juror Number 1 also stated that Juror Number 10's conveying of her feelings of fear did not affect her in any way. Another juror testified that Juror Number 10 told her that she knew someone or noticed someone in the gallery, but that it would not affect her ability to remain fair and open minded. The remaining jurors indicated that they could continue to be fair and open minded.

Smith moved for a mistrial and argued that Juror Number 10 had tainted the jury. Specifically, Smith's counsel stated:

> On behalf of Mr. Smith and probably Mr. Johnson, I would move for a mistrial. From all the actual jurors that we have heard, [Juror Number 10], obviously, Juror No 1 and Juror No 2, said that they had heard something about that she knew someone and . . . I don't know if they used the term "scared," but knew someone and was hesitant about having to see that person. She associated, and so did the others, this person as having been with one of the defendant's family. I don't think she knew who or what family, not to mention that her demeanor was that of crying and being upset. I would move for a mistrial on that basis that she has tainted the jury as well as the alternates, and that she has tainted enough of them that only . . . there are three that need to be replaced and there are only two alternates.

Id. at 656-657. The trial court stated:

> The Court, having questioned and having given the opportunity to all counsel to question every single person on this jury, the Court is satisfied that the jury has not been tainted by [Juror Number 10's] emotional condition and that the two jurors who had some conversation with her were very clear about their ability to view the evidence impartially and fairly and that the emotional state of [Juror Number 10] had no impact on their ability to do so, so I will deny the Motion for Mistrial of both Mr. Johnson and Mr. Smith.

11

Id. at 657-658. The court then questioned the alternate juror who indicated that she did not overhear any conversations that Juror Number 10 had with other jurors and that she could be fair and impartial, and the alternate replaced Juror Number 10 on the jury.

The jury found Smith not guilty of murder, guilty of robbery and attempted robbery, and did not reach a verdict as to felony murder. The court sentenced Smith to concurrent terms of twenty years for each count with the last two years to be served on the community corrections work release program.

I.

The first issue is whether the trial court abused its discretion and violated Smith's confrontation rights by admitting Callaway's deposition and by excluding the video reenactment. Generally, we review the trial court's ruling on the admission of evidence for an abuse of discretion. Noojin v. State, 730 N.E.2d 672, 676 (Ind. 2000). We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. Joyner v. State, 678 N.E.2d 386, 390 (Ind. 1997), reh'g denied. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. Fox v. State, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), reh'g denied, trans. denied.

A.      Deposition

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. "A witness's testimony against a defendant is thus inadmissible

12

unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Pendergrass v. State, 913 N.E.2d 703, 705 (Ind. 2009) (citing Crawford v. Washington, 541 U.S. 36, 124 S. Ct. 1354 (2004)), cert. denied, 130 S. Ct. 3409 (2010). Whether a witness is unavailable for purposes of the Confrontation Clause is a question of law. Fowler v. State, 829 N.E.2d 459, 465 (Ind. 2005), reh'g denied, cert. denied, 547 U.S. 1193, 126 S. Ct. 2862 (2006), abrogated in part on other grounds by Giles v. California, 554 U.S. 353, 128 S. Ct. 2678 (2008).[4] The Confrontation Clause generates only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. Id. at 469.

Article 1, Section 13(a) of the Indiana Constitution provides: "In all criminal prosecutions, the accused shall have the right to . . . meet the witnesses face to face . . . ." The Indiana Supreme Court has held that "Indiana's confrontation right contains both the right to cross-examination and the right to meet the witnesses face to face." Brady v. State, 575 N.E.2d 981, 988 (Ind. 1991).

Smith argues that he was denied the opportunity to cross-examine Callaway and that while his counsel was invited to attend the deposition she declined because she was advised by the State that Callaway was available for trial on May 23, 2011. Smith argues that "[i]f severance were granted, Smith could have objected to [Callaway's] trial testimony on the basis of relevance, given that [Callaway] never placed Smith at the

---

[4] In Roberts v. State, 894 N.E.2d 1018, 1025 (Ind. Ct. App. 2008), trans. denied, this court observed that the Fowler court addressed a broader view of the doctrine of forfeiture by wrongdoing in the context of the Confrontation Clause, which was rejected in Giles.

13

scene of the felony murder," and that "[g]iven the pending motion for severance, Smith did not have the same motive for cross-examining [Callaway] in this deposition, prior to the court ruling on his motion for severance, as he would at a joint trial." Appellant's Brief at 13. Smith also contends that the State failed to exercise reasonable diligence in order to locate Callaway before the commencement of trial.

The State argues that "[a]lthough at the time of Callaway's deposition Defendant had a pending motion for severance, a pending motion is not the equivalent of a granted motion and certainly does not excuse Defendant's failure to attend the deposition of the only known eyewitness to the crime." Appellee's Brief at 15. The State also argues that Smith's argument regarding the State's intent to use his ski mask as evidence is unavailing because as Smith acknowledged in his argument prior to the commencement of trial that the State had no knowledge of the mask until the night before trial.

To the extent that Smith appears to argue that the trial court erred by finding that Callaway was unavailable for trial under Ind. Trial Rule 32(A)(3)(d)[5] and that the State

---

[5] Ind. Trial Rule 32(A)(3)(d) provides:

Use of depositions. At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the Rules of Evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition, by or against any party who had reasonable notice thereof or by any party in whose favor it was given in accordance with any one [1] of the following provisions:

\* \* \* \* \*

(3)     The deposition of a witness, whether or not a party, may be used
        by any party for any purpose if the court finds:

\* \* \* \* \*

(d)     that the party offering the deposition has been

14

failed to exercise reasonable diligence in order to locate Callaway before the commencement of trial, we observe that Smith's attorney stated at trial: "I do believe that the State has made a good faith effort to secure him to be here at trial." Transcript at 354. Thus, we conclude that Smith has waived the issue of whether Callaway was unavailable for trial.

With respect to whether Smith had a prior opportunity for cross-examination, the record reveals that Smith's counsel was aware of the scheduled deposition and chose not to attend the deposition. We cannot say that the pending motion to sever impacts the analysis, and we conclude that Smith had an opportunity to cross-examine Callaway. Accordingly, we cannot say that Smith's right to cross-examination was violated. See Fowler, 829 N.E.2d at 467 ("It has long been recognized that the defendant can forfeit the right to confrontation. This notion is sometimes phrased as waiver, but the point is the defendant cannot complain of lack of confrontation that was available but not exercised.") (citing 5 Wigmore, *Evidence* § 1390 at 136 (Chadbourn rev. 1974) ("Where . . . the failure to obtain cross-examination is in any sense attributable to the *cross-examiner's own consent or fault*, the lack of cross-examination is of course no objection—according to the general principle that an opportunity, though waived, suffices.")); see also United States v. Johnpoll, 739 F.2d 702, 710 (2d Cir. 1984) (holding that the appellant waived his Sixth Amendment right of confrontation when he and his attorney voluntarily chose not to attend the deposition of an adverse witness), cert.

unable to procure the attendance of the witness by subpoena . . . .

15

*denied*, 469 U.S. 1075, 105 S. Ct. 571 (1984), reh'g denied; Simmons v. State, 234 S.W.3d 321, 326 (Ark. Ct. App. 2006) (holding that the defendant had a prior opportunity to cross-examine a witness where the defendant's attorney had the opportunity to depose the witness).

B.    Video Reenactment

It is somewhat unclear whether Smith is merely arguing that the trial court abused its discretion in excluding the video reenactment or also that such exclusion somehow impacted his right to confront his accuser. Smith acknowledges that the video reenactment here is unique, but that the foundational requirements for videotapes admitted under the "silent witness" theory are analogous. Appellant's Brief at 16. He argues that the proffered video featured a silent witness because Callaway had been declared unavailable for trial. Smith contends that the trial court could easily have given a limiting instruction to the jury with respect to the statements of law enforcement officers contained on the video. Smith also argues that it was for the jury to weigh Callaway's inconsistencies and determine his credibility as the State's sole witness to the crimes with which Smith was charged.

The State argues that the "silent witness" theory is inapplicable because it applies to the admission of substantive evidence rather than demonstrative evidence. In other words, the State argues that the silent witness theory would apply to the admission of an actual recording of the crimes but not to their reenactment. The State also argues that the videotape is not relevant because as the prosecutor pointed out Callaway does not mention Smith in either the demonstration or his deposition. The State also contends that

16

it is unclear whether the video could have been effectively redacted to exclude the hearsay statements because it appears from the court's description of the video that it was peppered by commentary by the police.

To reverse a trial court's decision to exclude evidence, there must have been error by the court that affected the defendant's substantial rights and the defendant must have made an offer of proof or the evidence must have been clear from the context. Woods v. State, 892 N.E.2d 637, 641 (Ind. 2008). An offer of proof is the method by which the proponent of evidence preserves any error in its exclusion. Tyson v. State, 619 N.E.2d 276, 281 (Ind. Ct. App. 1993), trans. denied. Generally, when a defendant does not make an offer of proof, he has not adequately preserved the exclusion of a witness's testimony as an issue for appellate review. Wiseheart v. State, 491 N.E.2d 985, 991 (Ind. 1986). An offer of proof provides the appellate court with the scope and effect of the area of inquiry and the proposed answers, in order that it may consider whether the trial court's ruling excluding the evidence was proper. Tyson, 619 N.E.2d at 281. Thus, the offer of proof must demonstrate the substance, purpose, relevancy, and materiality of the excluded evidence in order to enable the appellate court to determine on appeal whether the exclusion was proper. Id. "This offer to prove is necessary to enable both the trial court and the appellate court to determine the admissibility of the testimony and the prejudice which might result if the evidence is excluded." Wiseheart, 491 N.E.2d at 991. The purpose of an offer of proof is to convey the point of the witness's testimony and provide the trial judge the opportunity to reconsider the evidentiary ruling. Woods, 892

17

N.E.2d at 642. Equally important, it preserves the issue for review by the appellate court. Id.

During the trial, Smith's attorney stated that it would be beneficial for the jury to actually see Callaway, hear his words, and see his demeanor, but did not provide a detailed explanation of what the video reenactment contained or its relevance. The record reveals that the trial court viewed the video reenactment after its own suggestion, but Smith does not point to the record to suggest that the video was included in the record or that the contents of the video were detailed in some fashion. Further, Smith mentions Callaway's inconsistencies but does not specify what inconsistencies were present in the videotape. Based upon the record, we cannot say that any error in the exclusion of the videotape was preserved or that the trial court abused its discretion by excluding the video reenactment.

## II.

The next issue is whether the trial court abused its discretion by denying Smith's motion for a trial separate from that of his codefendant. Defendants have no absolute right to a separate trial or severance, but they may ask the trial judge to exercise her discretion to grant such a motion. Rouster v. State, 705 N.E.2d 999, 1004 (Ind. 1999) (citing Lampkins v. State, 682 N.E.2d 1268 (Ind. 1997), modified on reh'g by 685 N.E.2d 698 (Ind. 1997)), reh'g denied. Upon a motion by defendant, "the court shall order a separate trial of defendants whenever the court determines that a separate trial is necessary to protect a defendant's right to a speedy trial or is appropriate to promote a fair determination of the guilt or innocence of a defendant." Ind. Code § 35-34-1-11(b)

(2004). The decision to grant or deny a motion for separate trials is within the trial court's discretion. Underwood v. State, 535 N.E.2d 507, 514 (Ind. 1989), cert. denied, 493 U.S. 900, 110 S. Ct. 257 (1989), reh'g denied. An abuse of discretion occurs when a court denies a defendant's properly filed motion for separate trials and the parties' defenses are mutually antagonistic to such a degree that acceptance of one party's defense precludes the acquittal of the other.[6] Rouster, 705 N.E.2d at 1004. A defendant is not, however, entitled to a separate trial merely because a codefendant implicates that defendant. Id. We initially consider the events that actually occurred at trial to determine whether the motion for separate trials should have been granted. See id. at 1004-1005.

Smith does not appear to argue that the defenses were mutually antagonistic, but argues that the basis for his motion was "highly inflammatory 404(b) testimony delivered during the State's case in chief." Appellant's Brief at 19. Smith argues that "[a]lthough the State failed to show that Smith was present during a prior drug deal or even present at

---

[6] In Rouster, the Court noted:

Corpus Juris Secundum describes the degree of antagonism generally necessary to require severance as follows:

Defendants asserting allegedly antagonistic defenses may disagree on facts not comprising the core of their defenses without generating the kind of prejudice that mandates severance, and therefore it must be demonstrated that their defenses are so irreconcilable as to involve fundamental disagreement over the core and basic facts in order for severance on the grounds of conflicting defenses to be obtained. Defenses reach that level of antagonism necessary to warrant severance if the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other, or if the defense of one party, if believed, necessarily indicates the guilt of the other party, or if acceptance of one party's defense precludes acquittal of the other party.

22A C.J.S. Criminal Law § 569 (1989).

705 N.E.2d at 1004 n.3.

19

the scene during the felony murder, the State attempted to 'bootstrap' Smith to his co-defendant by virtue of their acquaintance and the co-defendant's 'bad acts' in the days after the crime." Id. Smith argues that the trial court ruled that the 404(b) evidence was relevant and probative on the issue of "knowledge" against Smith's codefendant, as the codefendant had admitted to the 404(b) acts. Smith argues that the trial court utilized the wrong standard, as the veracity of the 404(b) conduct is insufficient to determine its relevance to any issue other than a defendant's propensity to commit the charged act.

The State argues that the trial court properly denied Smith's motion to sever because the evidence did not have anything to do with Smith and because the jury was instructed not to consider this evidence against Smith.

To the extent that Smith argues that the State attempted to bootstrap Smith to his codefendant, we have reviewed the portions of the record cited by Smith and cannot agree with Smith's characterization. Further, prior to Corrionna's testimony, which is cited by Smith, the court gave the following limiting instruction: "Ladies and gentlemen, the testimony of Corrionna Johnson is to be considered by you only as it relates to defendant Robert Johnson. It should not be considered in any manner by the jury in determining the guilt or innocence of defendant Victor Smith." Transcript at 434. The court also gave the instruction as a final instruction. "Jurors are presumed to follow a trial court's admonishment." Kocielko v. State, 938 N.E.2d 243, 252 (Ind. Ct. App. 2010), reh'g granted in part, 943 N.E.2d 1282, trans. denied. We also observe that Detective Moore indicated during cross-examination that there was nothing to indicate in any way, shape, or form that Smith had anything to do with Corrionna Johnson.

20

Additionally, Smith's print was found on Swift's car and on Callaway's cell phone and when Smith was arrested a day after the robbery, he had a mask on his person and the men involved in the robbery wore masks.

It is the defendant's burden to show that a fair trial could not otherwise be had, and not merely that severance would enhance the prospects for acquittal. Lee v. State, 684 N.E.2d 1143, 1149 (Ind. 1997). Smith has failed to meet this burden and because "[t]here is a strong judicial policy in favor of joint trials where codefendants are charged with the same crime," Castro v. State, 580 N.E.2d 232, 234-235 (Ind. 1991), we affirm the trial court's denial of the motion for separate trials. See Lee, 684 N.E.2d at 1149.

### III.

The next issue is whether the trial court abused its discretion by denying Smith's motions for mistrial. "The granting of a mistrial lies within the sound discretion of the trial court, and we reverse only when an abuse of discretion is clearly shown." Davis v. State, 770 N.E.2d 319, 325 (Ind. 2002), reh'g denied. "The remedy of mistrial is 'extreme,' Warren v. State, 757 N.E.2d 995, 998-99 (Ind. 2001), strong medicine that should be prescribed only when 'no other action can be expected to remedy the situation' at the trial level, Gambill v. State, 436 N.E.2d 301, 304 (Ind. 1982)." Lucio v. State, 907 N.E.2d 1008, 1010-1011 (Ind. 2009).

Smith argues that the trial court abused its discretion when it denied his motions for mistrial based upon the ski mask, the deposition and "404(b) evidence of attempted murder," and the tainted jury. Appellant's Brief at 25.

A.     Ski Mask

Smith argues that the mask was not relevant and the court's failure to rule on the admissibility of the mask before trial compromised his ability to address the mask in opening statements, *voir dire*, or any cross-examination up until his motion for mistrial. Smith also argues that the ski mask was inadmissible "given that the State's witness was unable to distinguish between the personal effects taken from Smith and those retrieved from the co-defendant." Appellant's Brief at 24.

The State argues that Smith waived this issue because Smith does not cite to authority to support his argument that the ski mask was improperly admitted, and that the ski mask was relevant and properly admitted.

Smith does not cite to authority for his argument related to the ski mask or develop the argument. Consequently, this issue is waived. See, e.g., Cooper v. State, 854 N.E.2d 831, 834 n.1 (Ind. 2006) (holding that the defendant's contention was waived because it was "supported neither by cogent argument nor citation to authority"); Shane v. State, 716 N.E.2d 391, 398 n.3 (Ind. 1999) (holding that the defendant waived argument on appeal by failing to develop a cogent argument).

Waiver notwithstanding, we cannot say that the ski mask was irrelevant as Callaway testified that the men involved were wearing masks. To the extent that Smith suggests that the chain of custody was not sufficient, we observe that the sufficiency of an evidentiary foundation is a matter left to the trial court's sound discretion, and we will reverse only upon a showing of an abuse of that discretion. Payne v. State, 658 N.E.2d 635, 644 (Ind. Ct. App. 1995), trans. denied. An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances

before the court. Roush v. State, 875 N.E.2d 801, 808 (Ind. Ct. App. 2007). Regarding chain of custody in particular, the Indiana Supreme Court has held:

> The requirement that a chain of custody be proven by a party submitting physical evidence at trial is an attempt to satisfy the goal of assuring the trial court that the evidence submitted has not been substituted or tampered with. While the State is not required to exclude every possibility of tampering, the chain of custody must give reasonable assurances that the property passed through the hands of the parties in an undisturbed condition.

Johnson v. State, 580 N.E.2d 670, 671-672 (Ind. 1991) (quotation and citation omitted). Further, "the State need not establish a perfect chain of custody whereby any gaps go to the weight of the evidence and not to admissibility." Culver v. State, 727 N.E.2d 1062, 1067 (Ind. 2000), reh'g denied.

Detective Scott testified that the mask was recovered from Smith's person and that he placed the items in a plastic bag, transported them to the downtown facility, marked Smith's name, the date, and a description of the contents on a note which he placed inside the bag, and placed the bag on Detective Moore's desk. Detective Scott also testified that he recognized the items presented in court as those that were taken off Smith when he transported him to the homicide office. Detective Moore testified that she returned to the homicide office after executing a search warrant, inventoried the property, and placed the property in the property room. Detective Moore also testified that the black ski cap was the one that she placed in the property room. Based upon our review of the record, we cannot say that the trial court abused its discretion by admitting the ski mask or by denying Smith's motion for mistrial on this basis.

B.    Callaway's Deposition & Corrionna's Testimony

23

Smith argues that Callaway's deposition combined with the evidence of attempted murder "created such prejudice as to deny Smith a fair trial, where the only physical evidence was circumstantial." Appellant's Brief at 25. The State argues that both Callaway's deposition and Corrionna's testimony were properly admitted and points out that the court gave a limiting instruction with respect to Corrionna's testimony. In light of the foregoing discussion addressing the relevant deposition and testimony, we cannot say that the court abused its discretion in failing to grant Smith's motion for a mistrial on this basis.

C.    Jury

Smith did not argue at trial and does not appear to argue on appeal that the court erred by removing Juror Number 10. Rather, Smith argued at trial that the jury had been tainted and argues on appeal that the trial court abused its discretion by denying his motion to grant a mistrial because "jurors may well have associated one juror's removal with a threat of retaliation from members of the defendants' families." Appellant's Brief at 26.

The record reveals that the court questioned the jurors that had spoken with Juror Number 10. One of the jurors indicated that Juror Number 10's conveyance of her feelings of fear did not affect her in any way. The other juror indicated that anything Juror Number 10 said would not affect her ability to remain fair and open minded. The court also questioned all of the jurors and the alternate juror and all of them indicated that they could remain fair and open minded. Under the circumstances, we cannot say that the court abused its discretion by denying Smith's motion for a mistrial on this basis.

For the foregoing reasons, we affirm Smith's convictions for robbery as a class B felony and attempted robbery as a class B felony.

Affirmed.

BAKER, J., and KIRSCH, J., concur.